**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CARVAUGHN JOHNSON,<br><br>               Plaintiff,<br>   v.<br><br>DR. KATHLEEN MAURER, JOHN STREET, CONNIE WEIKOPF, MARY ELLEN CASTRO, RIKEL LIGHTNER, MONICA FARINELLA, ALEXIS GENDALL, COLLEEN GALLAGHER, LT. COLLINS, SYED JOHAR NAQVI, CAPTAIN OGANDO & TIM BOMBARD,<br><br>               Defendants. | Civil Action No.<br>No. 3:18-cv-694 (CSH)<br><br><br>**DECEMBER 6, 2018** |

**INITIAL REVIEW ORDER**

**HAIGHT, Senior District Judge:**

Plaintiff Carvaughn Johnson is currently incarcerated at MacDougall-Walker Correctional Institution and has filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 against twelve of the facility's employees in their individual and official capacities: Kathleen Maurer, John Street, Connie Weikopf, Mary Ellen Castro, Rikel Lightner, Monica Farinella, Alexis Gendall, Colleen Gallagher, Lt. Collins, Syed Johar Naqvi, Captain Ogando, and Tim Bombard. Doc. 1. Plaintiff has now filed an amended complaint ("Amended Complaint"). Doc. 6. For the following reasons, his Amended Complaint is dismissed in part.

## I.   STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be

granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b)(1)–(2) (2012). Although highly detailed allegations are not required, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[1] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663–64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). See also *Amaker v. New York State Dept. of Corr. Servs*., 435 F.

---

[1] The Second Circuit has consistently adhered to the United States Supreme Court's plausibility standard set forth in *Iqbal*. *See, e.g., Giunta v. Dingman,* 893 F.3d 73, 79 (2d Cir. 2018); *Bd.-Tech Elec. Co. v. Eaton Corp.,* 737 F. App'x 556, 558 (2d Cir. 2018); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017).

App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

With respect to *pro se* litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*)). See also *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (same)*; Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants); *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) ("A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (declaring that where the plaintiff proceeds *pro se*, a court is "obliged to construe his pleadings liberally") (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("In reviewing a *pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[].").

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010)

(quoting *Iqbal,* 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## II.   FACTUAL ALLEGATIONS

These factual allegations, accepted as true only for the purposes of this Order, are taken from Plaintiff's Amended Complaint. Doc. 6 ("Am. Compl."). Plaintiff describes three separate incidents as the basis for his claims.

The first concerns an injury sustained on June 6, 2017, when a cabinet door fell and struck Plaintiff on the shoulder while he was working in the laundry room of the correctional institution's infirmary. Am. Compl. ¶ 19. Plaintiff's maintenance supervisor, John Street, is allegedly the person responsible for ensuring cabinet doors are secure, but it is widely known that cabinet doors often fall because most cabinets are missing doors. *Id.* ¶¶ 19, 44. A nurse treated Plaintiff's bleeding wound and wrote an incident report on the same day. *Id.* Lt. Collins also took photos of the wound on the date of the injury, but never responded when Plaintiff asked him for a copy of the photograph on August 17, 2017. *Id.* ¶¶ 20, 30. This is despite Captain Ogando's verbal assurances on June 26, 2017, that the photo would be preserved, and Captain Ogando's failed efforts to find the photo and incident report on July 19, 2017. *Id.* ¶¶ 25, 27.

Because Plaintiff was still experiencing pain in his shoulder, arm, and neck, as well as muscle spasms in his shoulder—which he continues to experience today—he asked for an MRI in writing on June 21, 2017, and in person with Naqvi on June 25, 2017. *Id.* ¶¶ 22, 24, 59. Naqvi told Plaintiff that he never received an answer from the board presumably responsible for granting permission for

MRIs, but Plaintiff had reason to believe this was false because a nurse told him a request was never submitted to the board. *Id.* ¶ 24. Plaintiff wrote a grievance against Naqvi on August 17, 2017, appealing when it went unanswered despite administrative directive rules obligating the facility to respond within thirty days. *Id.* ¶¶ 29, 31–32. Plaintiff then separately wrote to health service administrators Rikel Lightner and Colleen Gallagher about the unanswered grievance in November 2017. *Id.* ¶¶ 32–33. When Plaintiff met with Lightner on November 30, 2017, Lightner advised Plaintiff to discuss his issues in his upcoming appointment with Naqvi. *Id.* ¶ 35. Gallagher wrote back on December 29, 2017, that an MRI may or may not be approved. *Id.* ¶ 43.

From October 2017 to December 2017, Plaintiff wrote to various individuals in an effort to seek care for his injury. *Id.* ¶¶ 36–42. He received replies that seemed inadequate to him from Mary Ellen Castro and Tim Bombard, and never received responses from Monica Farinella, Connie Weikopf, Alexis Gendell, and Kathleen Maurer. *Id.* ¶¶ 38, 40, 42.

Plaintiff received an x-ray on February 16, 2018, but he believes he should have received an MRI because he had already received an x-ray exam at MacDougall-Walker and an MRI would show issues with his muscles or nerve tissue. *Id.* ¶ 45. Plaintiff also wrote to Naqvi in February 2018 to inform him that his amitriptyline anxiety medication was not working;[2] he received a reply stating that he would have an appointment with Naqvi in March 2018. *Id.* ¶¶ 46, 61. However, Plaintiff was only able to meet with a nurse, who told him that Naqvi changed his medication to naproxen.[3]

---

[2] Defendant refers to amitriptyline as medication for psychosis or anxiety. Am. Compl. ¶ 61. According to a government website, amitriptyline is an antidepressant. *Amitryptyline*, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682388.html (July 15, 2017).

[3] Naproxen can be used to treat "mild to moderate pain." *Naproxen*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (Oct. 1, 2018).

*Id.* ¶ 46. Plaintiff claims to experience bad side effects from naproxen and told the nurse he would like to talk to Naqvi. *Id.*

The second incident stems from Plaintiff's injury from wearing sneakers sold by the Department of Corrections' commissary. *Id.* ¶¶ 63, 68. Plaintiff wrote to the medical unit on May 1, 2017, of his footwear-related injuries and June 13, 2017, that the prescribed foot cream was not working. *Id.* ¶¶ 63–64. He was able to meet with Naqvi on June 25. 2017. *Id.* ¶ 65. After explaining that his toenails were coming off and he had foot pain, Plaintiff was told to write to Lightner. *Id.* ¶¶ 65, 71. Plaintiff did so on June 26, 2017, and Lightner responded on July 12, 2017.[4] *Id.* ¶ 66.

Plaintiff went to see Naqvi again on July 24, 2017, because his foot problem persisted, but the doctor only told him that he would need to speak with Lightner and that Deputy Warden Roach would not let the medical unit issue "Sneaker Passes." *Id.* ¶¶ 67–68, 70. He then denied Plaintiff's request to see a foot specialist. *Id.* ¶ 67. On August 17, 2017, Plaintiff met with Lightner to seek approval for a "Sneaker Pass," as per Naqvi's instructions, but Lightner told Plaintiff that the commissary sold a variety of footwear and that a Unit Counselor could handle the issue. *Id.* ¶ 68. Plaintiff believes these statements to be untrue based on his knowledge of commissary footwear offerings and of the Unit Counselor's role. *Id.* Plaintiff also wrote to Roach on March 25, 2018, but it is unclear whether he received a response. *Id.* ¶ 71.

Barbara LaFrance, whose title and role is unknown, treated Plaintiff via Skype on an unspecified date, but Plaintiff asserts nothing was done as a result of the consultation. *Id.* ¶ 70.

---

[4] Plaintiff also wrote to Lightner on July 19, 2017, with Lightner responding on or about December 4, 2017. Am. Compl. ¶ 66. However, the Court is unclear what this exchange concerned because Lightner had responded on July 12, 2017, to Plaintiff's initial request. *Id.*

Naqvi then saw Plaintiff once more on March 29, 2018. *Id.* ¶ 71.

The third incident concerns only Captain Ogando. Plaintiff asserts that on July 29, 2018, Plaintiff happened to walk near whether Ogando was conducting strip searches of kitchen workers. *Id.* ¶ 72. Although Plaintiff works in the infirmary, not the kitchen, Ogando instructed him to get against the wall for a strip search. *Id.* Ogando also allegedly said, "So what, you like to file lawsuits." *Id.* Plaintiff was consequently strip-searched, seemingly out of retaliation for his complaints and lawsuits against the correctional institution's employees. *Id.*

### III. <u>ANALYSIS OF FEDERAL CLAIMS</u>

In his Amended Complaint, Plaintiff asserts two counts for which he alleges a number of federal and state law violations.[5] Am. Compl. ¶ 1, 19–72. It is not entirely clear to which count or counts Plaintiff attributes this list of rights violations,[6] and so the Court will proceed by examining each right that has been allegedly violated and determine if it applies to all of the counts raised by Plaintiff, beginning with Plaintiff's federal claims.

In Count I, he alleges that all Defendants violated his rights by acting with deliberate indifference to his serious medical needs caused by a falling cabinet door that was negligently maintained. *Id.* ¶¶ 19–62. In the first part of Count II, Plaintiff alleges Defendants again violated

---

[5] Plaintiff lays out the allegations in two counts, but his second count is best examined as two separate claims: one concerning the footwear issue and the other concerning the strip search. *See infra*.

[6] Plaintiff accuses Defendants of "deliberate indifference denying him Constitutionally adequate medical care . . . [a] malicious and pervasive pattern of severe abuse and retaliation that one can imagine in response to his exercise of filing grievances, complaints, and rights of access to the courts, lawsuit, [etc] . . . Negligence, Recklessness, Malpractice, Emotional Distress, Mental Distress, Intentional Infliction of Mental Distress, Negligent Infliction of Mental Distress, Cruel and Unusual Punishment, Discrimination, Equal Protection Clause, Abuse, Cruelty, Failure to Protect, Hindering Due Process, and Denying Access to the Court." Am. Compl. ¶ 1.

his rights by acting with deliberate indifference to his serious medical needs, this time caused by inadequate footwear sold by the commissary. *Id.* ¶¶ 63–72. Plaintiff's factual allegations in this part of Count II only mention Defendants Naqvi, Rikel Lightner, and Monica Farinella. *Id.* ¶¶ 63–72. In the second part of Count II—which the Court will refer to as Count III *infra* for purposes of clarity—Plaintiff alleges Captain Ogando strip-searched Plaintiff in retaliation for filing lawsuits against the correctional institution. *Id.* ¶ 72. Plaintiff seeks injunctive relief,[7] declaratory relief, and monetary damages. *Id.* ¶¶ 2, 74.

## A.    Individual Defendants in their Official Capacities

With respect to all Defendants, Plaintiff sues them in both their official and personal capacities. *Id.* at 1. As to individual defendants acting in their *official* capacities, "the eleventh amendment immunity protects state officials sued for damages." *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) (citing *Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985)). *See also Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (holding that claims for damages against defendants in their official capacities barred by Eleventh Amendment). To the extent that Plaintiff seeks damages from state officials in their official

---

[7] Plaintiff specifically asks for a preliminary injunction. Am. Compl. ¶ 2. However, the Court construes this as seeking for injunctive relief because he has not established a basis to ask for a preliminary injunction, i.e., "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious question going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (2) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 648, 650 (2d Cir. 2015). To the extent Plaintiff seeks a preliminary injunction and believes he can satisfy those criteria, he may file a motion seeking such relief.

capacity, his § 1983 claims are barred by the Eleventh Amendment and will be dismissed.[8]

However, Plaintiff also sues these individual defendants in their official capacities for declaratory and injunctive relief. Am. Compl. at 1. In particular, Plaintiff seeks (1) a declaratory judgment that Defendants violated his constitutional and state statutory rights and (2) an injunction, presumably to receive medical treatment for his shoulder and feet. *Id.* ¶¶ 2, 74. The Eleventh Amendment does not bar an action against a state official for violation of federal law if the plaintiff seeks an injunction regarding that official's future conduct. *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). *See also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n.14 (1985)); *Feng Li v. Rabner,* 643 F. App'x 57, 57–59 (2d Cir. 2016) ("As to the individual defendants, generally, state officials are not immune under the Eleventh Amendment if the 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'") (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645 (2002)). Moreover, Plaintiff asserts an Eighth Amendment claim against some Defendants for disregarding his serious medical condition. A viable constitutional claim for deprivation of medical services may include demands for injunctive relief

---

[8] If a § 1983 suit against a state official in his or her *official* capacity seeks *money damages*, the state is deemed to be the real party in interest because an award of damages would be paid from the state treasury. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48–49 (1994). Under such circumstances, the action is deemed to be against the state so that the state official is entitled to Eleventh Amendment immunity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). *See also, e.g.*, *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.") (citing *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)).

and monetary damages.  *See*, *e.g.*, *Koehl v. Dalsheim*, 85 F.3d 86, 89 (2d Cir. 1996) (remanding case to develop proof of his Eight Amendment claims for damages and for injunctive relief).

## B. Defendants Alexis Gendall, Connie Weikopf, Mary Ellen Castro, Tim Bombard, and Monica Farinella

Plaintiff does not state a claim against Defendants Alexis Gendall, Connie Weikopf, Mary Ellen Castro, Tim Bombard, and Monica Farinella.  Plaintiff alleges that he wrote to Gendall and Weikopf about his shoulder injury, but they never responded to him.  Am. Compl. ¶¶ 33, 36. Plaintiff does not otherwise mention these Defendants in the Amended Complaint.  Gendall and Weikopf are doctors within the University of Connecticut's Correctional Managed Health Care program.  *Id.* ¶¶ 8, 9.  Plaintiff declares that they are responsible for the overview of medical care for inmates, but offers no facts to support his allegations.[9]  *Id.*  Indeed, it seems apparent from the Amended Complaint that Syed Johar Naqvi was the doctor assigned to Plaintiff's care.  *See*, *e.g.*, *id.* ¶ 46.  These allegations do not state a claim that Gendall and Weikopf were deliberately indifferent to his medical needs or were responsible for any other alleged violations.  *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (holding the Court is not bound to accept conclusory allegations).

Plaintiff separately wrote to and received responses from Castro and Bombard about his shoulder injury.  Am. Compl. ¶¶ 36, 38–39, 40–41.  Castro directed Plaintiff to submit a "sick call request" and "write directly to [his] health services administrator."  *Id.* ¶ 38.  Bombard advised Plaintiff to write to Defendant Monica Farinella.  *Id.* ¶ 40–41.  Plaintiff does not otherwise mention Defendants Castro and Bombard in the Amended Complaint.  Castro and Bombard are APRNs, or

---

[9]  Plaintiff also wrote to Kathleen Maurer, a doctor who did not respond to him, but she seems to serve in a supervisory capacity as Medical Director.  Am. Compl. ¶ 37.

Advanced Practice Registered Nurses, but Plaintiff alleges they are responsible for the oversight of inmate care. *Id.* ¶¶ 13, 17. Because there are no facts supporting his assertion Castro and Bombard have supervisory roles and because they tried to help Plaintiff by directing him to others, the Court cannot credit Plaintiff's conclusory allegation that they "did nothing to ease his pain and suffering." *Id.* These allegations do not state a claim that Castro and Bombard were deliberately indifferent to his medical needs or were responsible for any other alleged violations. *See Faber*, 648 F.3d at 104.

As for Farinella, Plaintiff also wrote to her but received no response regarding his shoulder injury. Am. Compl. ¶ 36. Plaintiff also alleges that Farinella knew or should have known about his footwear-related injury. *Id.* ¶ 72. Farinella is a doctor within University of Connecticut's Correctional Managed Health Care program but does not seem to have a supervisory role. *Id.* ¶ 12. Plaintiff asserts that Farinella is responsible for the oversight of inmate care and thus knew or should have known about Plaintiff's inadequate medical treatment. *Id.* ¶¶ 12, 72. Plaintiff offers the fact that Farinella serves as a private consultant and an expert witness as evidence for his conclusion, but the Court fails to see how such non-supervisory roles support his allegations. *Id.* ¶ 72. Again, the entirety of the Amended Complaint suggests that Defendant Naqvi was the doctor responsible for Plaintiff's care concerning both his shoulder injury and his footwear-related injury. *See, e.g.*, *id.* ¶¶ 24, 65. These allegations do not state a claim that Farinella was deliberately indifferent to his medical needs or was responsible for any other alleged violations. *See Faber*, 648 F.3d at 104.

Plaintiff's claims against Defendants Gendall, Weikopf, Castro, Bombard, and Farinella are dismissed. Accordingly, only Defendants Maurer, Collins, Ogando, Naqvi, Lightner, Gallagher, and Street remain implicated in Count I, Defendants Naqvi and Lightner in Count II, and Defendant Ogando in Count III.

**C.**    <u>**Eighth Amendment Claims of Deliberate Indifference**</u>

The Eighth Amendment's prohibition on cruel and unusual punishment protects against deliberate indifference to a prisoner's serious medical needs by prison officials. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To demonstrate deliberate indifference to medical needs, a plaintiff must allege harmful acts or omissions that deny or delay unreasonably access to needed medical care or wantonly cause infliction of unnecessary pain. *Id.* at 104–06. Accordingly, not all failures by prison staff to provide medical care rise to the level of a constitutional violation. *Id.*; *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). "[A] prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith*, 316 F.3d at 184.

The deliberate indifference standard consists of two prongs: (1) the alleged deprivation must be, objectively, "sufficiently serious" to produce death, degeneration, or extreme pain; and (2) subjectively, the defendant must have been aware of a substantial risk that the inmate would suffer serious harm by defendant's act or omission. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006*); Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

As to the first prong, "[a] 'serious medical need' exists where, objectively, the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Harrison v. Barkly*, 219 F. 3d 132, 136 (2d Cir 2000)).

> When the basis for a prisoner's Eighth Amendment claim is a
> temporary delay or interruption in the provision of otherwise adequate
> medical treatment, it is appropriate to focus on the challenged delay
> or interruption in treatment rather than the prisoner's underlying
> medical condition alone in analyzing whether the alleged deprivation
> is, in objective terms, sufficiently serious[] to support an Eighth
> Amendment claim.

*Smith*, 316 F.3d at 185 (internal quotation marks omitted).

As to the second, subjective prong, the defendant must have been actually aware of a

substantial risk that the inmate would suffer serious harm as a result of his or her actions or

inactions:

> To establish deliberate indifference, [the plaintiff] must show that
> [the defendant] harbored the requisite mental state while he denied
> . . . treatment. He must show that [the defendant] knew of and
> disregarded an excessive risk to [plaintiff]'s safety; that he not only
> was aware of facts from which a reasonable person would conclude
> [plaintiff] faced an excessive risk, but that he personally actually drew
> that inference.

*Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (per curiam). *See also Salahuddin*, 467 F.3d at

279–80. Thus, an allegation of mere negligence is insufficient. Rather, the subjective element

requires that an inmate allege that prison officials acted with "a mental state equivalent to subjective

recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280.

## 1. <u>Count I - Shoulder Injury</u>

Plaintiff received immediate treatment to stop the bleeding after the cabinet door fell on his

shoulder in June 2017, but he continued to experience pain months after the accident despite

repeated requests for proper medical treatment. Am. Compl. ¶¶ 19, 26, 59. After the dismissal of

various Defendants in Section III.B *supra*, the Court assumes that Plaintiff maintains a claim of

deliberate indifference to medical needs against medical personnel Kathleen Maurer, Syed Johar

Naqvi, Colleen Gallagher, and Rikel Lightner and correctional personnel John Street, Lieutenant Collins, and Captain Ogando.

With respect to the first prong of his deliberate indifference claim, Plaintiff has adequately alleged the objective seriousness of the deprivation he suffered. He claims that he is still in chronic pain and continues to experience muscle spasms in his shoulder, arm, and hand when he filed his initial complaint in this Court in April 2018—more than ten months after his injury. *Id.* ¶ 59. This is sufficient to plead an objectively serious injury. *See Joyner v. Greiner*, 195 F. Supp. 2d 500, 502–04 (S.D.N.Y. 2002) (finding prisoner's back pain, consisting of radiating pain and muscle spasms, was an objectively serious injury); *Cole v. Artuz*, No. 97 Civ 0977 (RWS), 2000 WL 760749 (S.D.N.Y. 2000) (finding that debilitating back injury that produced painful muscle spasms was not as dramatic as some other conditions that satisfy the deliberate indifference standard but it was not insufficient as a matter of law).

As to the second prong of this claim—alleging that the defendant was subjectively aware of a substantial risk that the inmate would suffer serious harm—the facts presented in the Amended Complaint are inadequate against all but one Defendant. The Court will address the allegations against corrections personnel and medical personnel separately.

The Amended Complaint fails to establish that Defendants Street, Collins, and Ogando, correctional personnel at MacDougall-Walker, were aware of Plaintiff's sustained injuries resulting from the cabinet door accident. The only mention of Street is that he was the maintenance supervisor responsible for securing cabinets and doors. Am. Compl. ¶ 44. Meanwhile, the thrust of the allegations against Collins and Ogando are that they were unresponsive to Plaintiff's request to produce the incident report and photograph that Collins took on the day of the accident. *Id.* ¶¶ 21,

23, 27, 30. The Court will revisit allegations against Street, Collins, and Ogando in its analysis on Plaintiff's negligence and recklessness claims, but such facts do not raise a deliberate indifference to medical needs claim. Plaintiff never establishes that Collins or Ogando knew about his muscle pains, and, in any case, the photograph was taken before Plaintiff raised any concerns about his muscle pains, making the photograph seemingly irrelevant to Plaintiff's deliberate indifference claim. The photograph appears to have only documented the bleeding, which was treated on the day of the injury. *Id.* ¶¶ 19–22. Collins took the photograph in the infirmary on June 6, 2017, whereas Plaintiff first wrote to the medical unit about his muscle pains on June 21, 2017. *Id.* ¶¶ 21–22.

As for health service administrators Gallagher and Lightner, Plaintiff alleges that they made administrative missteps, but the Court fails to see how they amount to a deliberate indifference claim. Specifically, Plaintiff filed a grievance against Naqvi about his medical treatment, and Gallagher and Lightner did not respond in a timely manner. *Id.* ¶¶ 32–33, 35, 43. Nowhere in the Amended Complaint does Plaintiff allege facts suggesting that Gallagher and Lightner "disregarded an excessive risk to [Plaintiff's] safety." *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (per curiam). Gallagher and Lightner, in fact, both responded to Plaintiff's complaints: Lightner told him to raise his issues at his upcoming medical appointment, and Gallagher told him that approval for an MRI exam was dependent on an orthopedics consultation. Am. Compl. ¶¶ 35, 43**.** That they responded a few days after the requisite thirty-day administrative response requirement and apparently provided unsatisfactory answers is not enough to raise a deliberate indifference claim. Gallagher and Lightner's responses actually seem to suggest that, as far as they knew, Plaintiff was receiving or would receive medical treatment for his injuries.

This leaves the doctors responsible for Plaintiff's medical care—Naqvi, who directly treated

Plaintiff, and Maurer, who was presumably in a supervisory capacity as medical director. Naqvi appears to have been aware of Plaintiff's condition, but he allegedly took no action to alleviate Plaintiff's pain months after Plaintiff raised his concerns. Taking the facts raised in the Amended Complaint as true, Naqvi was aware of Plaintiff's pain as soon as June 25, 2017, and had continued knowledge because Plaintiff repeatedly informed Naqvi of his condition. Am. Compl. ¶ 24; *see, e.g.*, *id.* ¶ 34. However, it appears that the only treatment done were two diagnostic x-rays, which Plaintiff argues would not show damage to his muscles or nerves.[10] *Id.* ¶ 45. The first action taken to actually relieve Plaintiff's pain was apparently when Naqvi prescribed naproxen to Plaintiff, but this was not until March 21, 2018—about ten months after Plaintiff first informed Naqvi. *Id.* ¶ 46. Thus, Plaintiff has shown that Naqvi was aware of but disregarded Plaintiff's serious injury, fulfilling the subjective prong of a deliberate indifference claim.

Plaintiff alleges that Maurer is the medical director, *id.* ¶ 37, meaning Maurer could be responsible for deliberate indifference under a supervisory liability theory. "A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir. 2014); *Blyden v. Mancusi*, 186 F.3d 252, 264 (2d Cir. 1999).

> The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly

---

[10] To be clear, the lack of an MRI does not constitute deliberate indifference. *Victor v. Milicevic*, 361 F. App'x 212, 214–15 (2d Cir. 2010) ("[T]he failure to order an MRI of Victor's back did not rise to the level of deliberate indifference . . . Whether to order an MRI or similar diagnostic treatments 'is a classic example of a matter for medical judgment.'" (internal citation omitted)).

> negligent supervision of subordinates who committed a violation, or
> (5) failure to act on information indicating that unconstitutional acts
> were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003). As applicable to Plaintiff's claims, Maurer may be found liable under two of these theories: (1) if she were deliberately indifferent in a direct manner, or (2) in supervising Naqvi, she exhibited gross negligence or deliberate indifference to a high risk that Naqvi would violate Plaintiff's constitutional rights, and Maurer's neglect caused Naqvi to violate Plaintiff's rights.

The only allegation against Maurer is that Plaintiff wrote to Maurer on October 20, 2017, and she never wrote back. Am. Compl. ¶ 37. As with Defendants Gendall and Weikopf, it does not appear that Maurer was Plaintiff's treating physician, and so Plaintiff has not alleged sufficient facts to hold Maurer directly responsible for Plaintiff's lack of treatment. As for supervisory liability due to Naqvi's alleged deliberated indifference, it does not appear that Maurer had the requisite notice. *Poe*, 282 F.3d at 141 ("For a supervisor to be liable under section 1983 for his failure to inquire, he must first have been on notice that his subordinate was prone to commit some unconstitutional or unacceptable behavior."). *Id.* at 141. Plaintiff's letter to Maurer may have created notice that he was in need of medical help, but she had no notice that Naqvi was committing any constitutional violations. The letter was sent less than four months after Naqvi first had knowledge of Plaintiff's lingering pain and muscle spasms from Plaintiff's appointment with Naqvi on June 25, 2017. Am. Compl. ¶ 24*; see Hernandez*, 341 F.3d at 146 (dismissing Plaintiff's deliberate indifference claims, in part, because surgery was only delayed for a few months). Thus, only a claim against Naqvi in relation to Count I of Plaintiff's Amended Complaint survives.

## 2. <u>Count II - Footwear-Related Injury</u>

Plaintiff has not raised facts to sustain a claim against the only remaining Defendants mentioned in Count II, Naqvi and Lightner. The Court first addresses the subjective prong of a medical indifference claim as it is dispositive.

"The prisoner's right is to medical care—not the type or scope of medical care which he personally desires. A difference of opinion between a physician and patient does not give right to a constitutional right or sustain a claim under § 1983." *United States ex rel. Hyde v. McGinnis*, 429 F.2d 867–68 (2d Cir. 1970) (citation and internal quotation marks omitted); *see also Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given in adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

Defendants had prescribed cream and suggested Plaintiff purchase different footwear to remedy his foot pain and toenail problem. Am. Compl. ¶¶ 64, 68. Although the cream was presumably ineffective, it seems that Plaintiff merely disagrees that purchasing different footwear at the prison commissary is the right course of treatment. Instead, Plaintiff believes that he needs a "Sneaker Pass" to solve his footwear issues. *Id.* ¶¶ 68, 60. Plaintiff declares that the "[c]ommissary sells very inadequate footwear" without providing substantiating facts. *Id.* ¶ 68. Based on the Amended Complaint, the Court is unable to ascertain the difference between "Sneaker Pass" footwear and footwear available at the commissary, nor why shoes obtained with a "Sneaker Pass" would help treat Plaintiff's injuries but shoes available at the commissary would not.

Failing to find more than Plaintiff's mere disagreement with the proposed treatment, the

Court declines to consider the objective prong of a deliberate indifference claim with respect to Plaintiff's footwear-related injury.[11]

### 3.     <u>Count III - Strip Search</u>

Plaintiff does not allege he received any injuries from being strip-searched, Am. Compl. ¶ 72, and so the Court will not engage in a deliberate indifference analysis regarding Count III.

Accordingly, the only allegation of deliberate indifference to medical care that may proceed is against Defendant Naqvi as it pertains to Plaintiff's shoulder injury as recounted in Count I. All deliberate indifference claims against other Defendants are DISMISSED.

## D.     <u>Eighth Amendment Cruel and Unusual Punishment</u>

In addition to alleging Eighth Amendment violations relating to deliberate indifference, Plaintiff also raises claims of abuse, cruelty, and cruel and unusual punishment. Am. Compl. ¶ 1. The Court will analyze these claims collectively under the Eighth Amendment cruel and unusual punishment standard. "[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (quoting *Hudson v. McMillian*, 503 US. 1, 4 (1992)). However, "not 'every malevolent touch by a prison guard gives rise to a federal cause of action.'" *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9); *see also Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) (noting that not every push or shove violates prisoner's constitutional rights); *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) ("Hence, a de minimis use of force will rarely suffice to state a constitutional claim."). To establish a claim of excessive force under the Eighth Amendment, the prisoner must

---

[11] Based on the facts as presented, it is unclear whether Plaintiff's foot pain and falling off of toenails rises to the level of a medical condition that "cause possible death, degeneration, or extreme pain." *Cole v. Fischer*, 416 F. App'x 111, 113 (2d Cir. 2011).

satisfy a subjective and objective component. *See, e.g., Sims*, 230 F.3d at 20–21. "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Id.* at 21 (citation and internal quotation marks omitted). With respect to excessive force, the subjective component requires a showing that official's use of physical force was exerted "maliciously and sadistically rather than as part of 'a good faith effort to maintain or restore discipline.'" *Wilkins*, 559 U.S. at 40 (quoting *Hudson*, 503 U.S. at 9).

The objective component "focuses on the harm done" in light of contemporary standards of decency, but the amount of harm that must be shown depends on the nature of the claim. *Sims*, 230 F.3d at 21; *Banks v. Cty. of Westchester*, 168 F. Supp. 3d 682, 688 (S.D.N.Y. 2016). Some degree of injury ordinarily will be required. *Banks*, 168 F. Supp. 3d at 688. However, the prisoner does not have to show that he sustained a significant injury in order to prevail on an excessive force claim. *Sims*, 230 F.3d at 22; *Wilkins*, 559 U.S. at 37. A prisoner sufficiently states an Eighth Amendment claim if he "alleges facts from which it could be inferred that prison officials subjected him to excessive force, and did so maliciously and sadistically . . . ." *Sims*, 230 F.3d at 22.

### 1.     <u>Count I - Shoulder Injury and Count II - Footwear-Related Injury</u>

The Court has already dismissed Plaintiff's Eighth Amendment deliberate indifference claims for Counts I and II. Deliberate indifference is a subset of cruel and unusual punishment, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and Plaintiff has not alleged how Defendants' actions with respect to Counts I and II would otherwise constitute cruel and unusual punishment. The Court thus declines to engage in a separate Eighth Amendment cruel and unusual punishment analysis for Counts I and II.

### 2.    <u>**Count III - Strip Search**</u>

"Under certain limited circumstances, the manner in which a search is conducted may give rise to an Eighth Amendment claim." *Green v. Martin*, 224 F. Supp. 3d 154, 168 (D. Conn. 2016) (citations and internal quotation marks omitted).   "However courts are generally reluctant to conclude that strip searches—even where an inmate alleges aggressive or inappropriate behavior—rise to the level of objectively serious enough to constitute an Eighth Amendment violation."  *Id.*   A violation would occur if "[a] correction officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015).  The "principal inquiry" a court must make "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58.  It is clear that "prison officials looking for contraband may subject inmates to reasonable strip searches and cavity searches," but that such a search "may not be undertaken maliciously or for the purposes of sexually abusing the inmate." *Id.* at 258. *See also Bell v. Wolfish*, 441 U.S. 520, 560 (1979) (holding that body cavity searches of inmates must be reasonable in scope).

Although Plaintiff has raised a Fourth Amendment claim related to Count III, *see infra*, his allegations do not rise to the level of a cruel and unusual punishment claim under the Eighth Amendment.  Courts within this Circuit have held that "a strip search without elements of sexual harassment, excessive force, or indeed any physical contact at all is not sufficiently serious under the objective prong to support a claim based on cruel and unusual punishment under the Eighth Amendment." *Green*, 224 F. Supp. 3d at 168–69 (citations and internal quotation marks omitted)

(collecting cases). Plaintiff includes few details of the strip search itself, but even with a "brief instance of alleged sexual touching," it would not be "severe enough to constitute a serious deprivation of the plaintiff's basic human needs." *Davilla v. Messier*, No. 3:13-cv-81 (SRU), 2014 WL 4638854, at *5 (D. Conn. 2014). Without more, the strip search by itself does not constitute cruel and unusual punishment. To the extent Plaintiff makes cruel and unusual punishment claims outside of his deliberate indifference claims against all Defendants, those claims are DISMISSED.

E.      **Eighth Amendment Failure to Protect**

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of . . . inmates." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). A prison official violates the prisoner's Eighth Amendment protection against cruel and unusual punishment only when the following two requirements are satisfied. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). First, the prisoner must prove that the deprivation was "objectively, sufficiently serious." *Id.* at 834 (citation omitted). If the claim is based on the official's failure to prevent harm, the plaintiff must prove that he is "incarcerated under conditions posing a substantial risk of serious harm." *Id.*

Second, the prisoner must prove that the prison official acted with a "sufficiently culpable state of mind." *Id.* (citation omitted). This requirement is based on the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." *Id.* (citation omitted). The prison official must have known of and disregarded an excessive risk to the prisoner's health or safety. *Id.* at 837. Whether an official had knowledge of a substantial risk of harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842.

The Amended Complaint does not state what harms against which the Defendants have

allegedly failed to protect Plaintiff. Perhaps a falling cabinet door could be categorized as a harm, but it would likely not rise to the level of an objectively serious harm. The Court is unable to guess what other harms existed or how Defendants were subjectively indifferent to such harms. Accordingly, all failure to protect claims under the Eighth Amendment against Defendants are DISMISSED.

**F.**     **Retaliation and Denial of Access to Courts**

Plaintiff alleges that unspecified Defendants retaliated against him for seeking medical care and for filing grievances and lawsuits. Am. Compl. ¶¶ 54, 60. "[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation and internal quotation marks omitted). An adverse action, as used in the second prong, refers to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and internal quotation marks omitted). As for the causation requirement of the third prong, "allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Id.* at 354.

Related to his retaliation claim is Plaintiff's claim that Defendants denied him access to the courts. It is well-established that prisoners have a constitutional right of access to court. *Lewis v. Casey*, 518 U.S. 343, 346 (1996); *Bounds v. Smith*, 430 U.S. 817, 828 (1977). To make an access-to-court claim, a prisoner must pass the *Lewis* test by establishing a "official's interference with, or failure to assist his advocacy efforts" and "demonstrat[ing] that [prison practices] hindered his efforts

to pursue a legal claim." *Arce v. Walker*, 58 F. Supp. 2d 39, 43 (W.D.N.Y. 1999) (quoting *Lewis*, 518 U.S. at 351 (internal quotation marks omitted)).

### 1.  Count I - Shoulder Injury and Count II - Footwear-Related Injury

Plaintiff alleges Defendants did not provide him with adequate treatment to punish him for seeking medical care and for filing grievances and lawsuits. Am. Compl. ¶¶ 54, 60. The Amended Complaint does not sufficiently allege that the Defendants took adverse action against Plaintiff. Indeed, the Plaintiff was able to see a doctor—including the same doctor against whom he had filed a grievance—multiple times for his various medical maladies. *Id.* ¶¶ 29, 71. By the Court's count, Plaintiff received medical attention at least nine times for either his cabinet door accident or footwear-related injury. *Id.* ¶¶ 19, 24, 45, 46, 64, 65, 67, 69, 71. He has received treatment, albeit perhaps not his preferred treatment, as a result of some of those appointments. The Court declines to credit this allegation of retaliation as it pertains to Counts I and II. *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (holding the Court is not bound to accept conclusory allegations).

With respect to denying him access to the courts, Plaintiff declares that "[D]efendants have continually ignored the [P]laintiff's injury to keep [P]laintiff out of court and because of [P]laintiff's previous lawsuit." Am. Compl. ¶ 59. In addition, although Plaintiff does not explicitly relate it to denial of access, he claims that Defendants give him amitriptyline, described as an anti-psychotic medication, to "quell" his complaining. *Id.* ¶ 61. As with the retaliation claim, Plaintiff has not shown that Defendants interfered or hindered his ability to file grievances or lawsuits because he has been able to seek medical treatment. Moreover, there seems to be little aside from Plaintiff's accusations to connect the purported lack of medical treatment with a sinister motivation to prevent

Plaintiff from taking legal action. For example, Plaintiff seems to implicitly acknowledge that he is knowingly and willing taking amitriptyline for one of his medical conditions, not because the medical doctors want to keep from pursuing his legal claims. *Id.* ¶ 46 ("[P]laintiff wrote a request to Dr. Naqvi telling him that the medication amitriptyline wasn't working."). The Court also declines to credit Plaintiff's allegation of denying him access to the court as it pertains to Counts I and II. Accordingly, any retaliation and denial of access to the court claims as related to Counts I and II are DISMISSED.

### 3. <u>Count III - Strip Search</u>

The nature of Count III differs in kind from Counts I and II, raising a sufficient facts to allege retaliation and punishment of Plaintiff for exercising his legal rights. Plaintiff's Amended Complaint is sufficient to raise a retaliation claim because he has the protected right of access to courts, Defendant Ogando took adverse action by subjecting him to a strip search, and there is a causal connection between the strip search and Plaintiff's filing of lawsuits. Am. Compl. ¶ 72; *see Gill*, 389 F.3d at 380 (outlining *supra* test for retaliation). In particular, Ogando's comment about Plaintiff's penchant for filing lawsuits supports Plaintiff's claim that there was a causal connection between the alleged adverse action and protected right.

The same facts, however, do not support a denial of access to courts claim since Ogando did not prejudice or impair Plaintiff's ability to access the courts, as required by the *Lewis* test. Accordingly, only the retaliation claim against Ogando in relation to Count III may proceed.

### G. <u>Fourth Amendment Violation</u>

Count III also raises Fourth Amendment concerns. Although "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell,

*Hudson v. Palmer*, 468 U.S. 517, 526 (1984), . . . maintenance of prison security is not burdened unduly by the recognition that [prisoners] do retain a limited right to bodily privacy, *Covino v. Patrissi*, 967 F.2d 73, 78 (2d Cir. 1992)." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (lateral citation omitted). "Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the inmate has exhibit[ed] an actual, subjective expectation of bodily privacy; and (2) second, the court must determine whether the prison officials had sufficient justification to intrude on [the inmate's] [F]ourth [A]mendment rights." *Id.* (quoting *Covino*, 967 F.2d at 77–78) (internal quotation marks omitted).

Defendant Ogando subjected Plaintiff to a strip search, which can violate the Fourth Amendment when it does not "serve any legitimate penological purposes, or that each search was specifically designed to intimidate, harass or punish." *Green v. Martin*, 224 F. Supp. 3d 154, 164 (D. Conn. 2016) (citations and internal quotation marks omitted). Based on Plaintiff's Amended Complaint, Ogando's order to have Plaintiff strip-searched appears to have no legitimate purpose in seeking out contraband or otherwise. Others who were strip-searched were staffed to the kitchen and in response to an "incident that occurred in the kitchen." Am. Compl. ¶ 72. Plaintiff does not work in the kitchen. *Id.* Moreover, Ogando's words to Plaintiff suggest the strip search was done to punish or harass Plaintiff for filing lawsuits. *See id.* Accordingly, Plaintiff has stated a sufficient claim for a Fourth Amendment violation against Defendant Ogando in Count III.

## H.    Equal Protection Clause

Plaintiff invokes the Equal Protection Clause of the Fourteenth Amendment, which requires that the government treat similarly situated people in a similar manner. *City of Cleburne v. Cleburne*

*Living Ctr.*, 473 U.S. 432, 439 (1985). "This provision does not mandate identical treatment for each individual." *Muhmmaud v. Murphy*, 632 F. Supp. 2d 171, 178 (D. Conn. 2009) (citing *City of Cleburne*, 473 U.S. at 439–40). To prevail on such a claim, a plaintiff must demonstrate that "he was treated differently from other similarly situated individuals and that the reason for this different treatment was based on 'impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Id.* (quoting *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)). Plaintiff has not asserted or alleged that he is a member of a protected class or that he was mistreated based on some suspect classification by any of the Defendants.

Thus, the Court assumes that Plaintiff's equal protection claim is based on a "class of one theory." *See Muhmmaud*, 632 F. Supp. 2d at 179. To state such a claim, he must allege that "(1) he has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment." *See id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Plaintiff has not alleged that he was intentionally treated differently by Defendants, that he was treated differently than any other similarly situated inmate or that there was not a rational basis for the treatment. Without any such allegations, the Court is unable to conclude that Plaintiff has stated a viable equal protection claim. *See id.* Any equal protection claims against all Defendants are DISMISSED.

## I. Due Process Clause

Plaintiff's due process claims arise out of the state penal system, so the Court looks at these claims under the Fourteenth Amendment, not the Fifth Amendment. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United

States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'").  It is not clear from the Amended Complaint to what exactly Plaintiff is alleging is a violation of his due process rights.  The Court surmises that Plaintiff would argue that deliberate indifference to his medical needs, late responses to his administrative grievances, and the strip search would constitute due process violations.  To the extent he makes these arguments, Plaintiff has not sufficiently alleged a due process claim.

The Fourteenth Amendment does not apply to Plaintiff's deliberate indifference to medical needs claim because he is not a pretrial detainee.  *See Nielsen v. Rabin*, 746 F.3d 58, 64 n.2 (2d Cir. 2014) ("Nielson alleged a violation of his Fourteenth Amendment due process rights because the alleged withholding of medical attention took place during his pretrial arrest and detainment.").  See also *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims are evaluated under the Due Process Clause because pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." (citations and internal quotation marks omitted)).

As for Plaintiff's dissatisfaction with the timeliness and responses to his filed grievances, "[p]risoners have no constitutionally protected right to have prison officials comply with grievance procedures or even to respond to grievances."  *Green v. Martin*, 224 F. Supp. 3d 154, 169–70 (D. Conn. 2016) (citing *Kalican v. Dzurenda*, No. 12–1009, 2015 WL 1806561, at *6 (D. Conn. Apr. 21, 2015) (no constitutional entitlement to have prison officials comply with grievance procedures or respond to grievances)); *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established . . . that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or

respond to a prisoner's grievance does not in itself give rise to a constitutional claim."); *see also Fernandez v. Armstrong*, No. 02–2252, 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right.").

If Plaintiff is alleging a substantive due process violation against Defendant Ogando for the strip search, such a claim is duplicative of his Fourth Amendment claim for an unreasonable search. As such, this claim is dismissed. *See Roman v. Velleca*, No. 11–1867, 2012 WL 4445475, at *10 (D. Conn. Sept. 25, 2012) ("[S]ubstantive due process claims must be dismissed where they are merely duplicative of claims explicitly protected under other constitutional sources." (citing *Kia P. v. McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000))). Accordingly, any due process claims against all Defendants are DISMISSED.

## IV. ANALYSIS OF STATE CLAIMS

### A. Supplemental Jurisdiction

Plaintiff raises a number of state law claims: negligence, recklessness, malpractice, and intentional and negligent infliction of emotional and mental distress. Am. Compl. ¶ 1. Consideration of these claims requires supplemental jurisdiction.

The Court may exercise supplemental jurisdiction over state law claims:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a) (2016). "The concept of supplemental jurisdiction, first codified in 28 U.S.C. § 1367 in 1990, has its origins in the judicial doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–29 (1966)." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (lateral citations omitted).  Under *Gibbs*, "a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Lee*, 316 F.3d at 305 (citing and quoting *Gibbs*, 383 U.S. at 725).  District courts apply the "common nucleus of operative fact" test to determine whether supplemental jurisdiction exists in a given case. *See*, *e.g.*, *Morris v. Yale Univ. Sch. of Med.*, No. 05CV848 (JBA), 2006 WL 908155 at *3 (D. Conn. Apr. 4, 2006).

Moreover, the Second Circuit stated of the Article III constitutional concept: "A state law claim forms part of the same controversy if it and the federal claim derive from a common nucleus of operative fact. This is so even if the state law claim is asserted against a party different from the one named in the federal claim." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (citations and internal quotation marks omitted).

The Court will presently exercise supplemental jurisdiction over Plaintiff's state law claims. His claims of negligence, recklessness, and malpractice arise out of the common nucleus of operative fact that forms the basis of his federal claims—Defendants' treatment of him after the cabinet door injury, the footwear injury, and the strip search.

**B.**     <u>**Negligence and Recklessness**</u>

Connecticut state law bars all of the state law negligence claims against Defendants.  These claims are brought against state prison officials for their  allegedly negligent actions and/or inactions taken within the scope of their employment.  Under Connecticut law, "state employees may not be held personally liable for their negligent actions performed within the scope of their employment." *Miller v. Egan*, 265 Conn. 301, 319 (2003) (citing Conn. Gen. Stat. §4-165).   Therefore, if a corrections officer or prison official acts negligently, as opposed to wantonly or recklessly, in the scope of his employment, Conn. Gen. Stat. § 4-165(a)  bars recovery on a negligence claim.

Under Conn. Gen. Stat. § 4-165(a), "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment."  *See, e.g.*, *Hamilton v. Lajoie*, 660 F. Supp. 2d 261, 266 (D. Conn. 2009) (holding that if defendant correction officers "acted wantonly, that will support [plaintiff's]  claim . . . that they violated his constitutional rights;" but if they "acted negligently, . . . § 4-165(a) bars recovery" where correctional officers engaged in altercation with inmate, resulting in inmate's head trauma, abrasions to ear and shoulder, and post-traumatic stress); *Schofield v. Magrey*, No. 3:12CV544 JBA, 2015 WL 521418, at *13 (D. Conn. Feb. 9, 2015) ("To the extent that Plaintiff asserts claims against the individual [police officer] defendants in their personal capacities, rather than the Towns, Conn. Gen. Stat. § 4-165 applies," so "Plaintiff's negligence-based claims against Defendants . . . must be dismissed."); *Ziemba v. Lajoie*, No. 3:11CV845 (SRU), 2012 WL 4372245, at *5 (D. Conn. Sept. 24, 2012) (dismissing negligence claims against correctional officers under Conn. Gen. Stat. § 4–165 because 'state employees may not be held personally liable for their negligent actions performed within the scope of their employment'") (quoting *Hamilton*, 660 F.

Supp. at 265). Accordingly, pursuant to Conn. Gen. Stat. § 4-165(a), Plaintiff's negligence claims against all Defendants are DISMISSED.

In contrast, "[s]tate employees do not . . . have statutory immunity for wanton, reckless or malicious actions, or for actions not performed within the scope of their employment." *Miller,* 265 Conn. at 319. "For those actions, they may be held personally liable, and a plaintiff who has been injured by such actions is free to bring an action against the individual employee." *Id.* Under Connecticut state law, "the plaintiff must prove . . . the existence of a state of consciousness with reference to the consequences of one's act." *Martin v. Brady*, 802 A.2d 814, 819 (Conn. 2002).

> Such conduct is more than negligence, more than gross negligence . . . . In order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them . . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action . . . . In sum, such conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.

*Id.* (quoting *Shay v. Rossi*, 749 A.2d 1147, 1172 (Conn. 2000), *overruled on other grounds by Miller v. Egan*, 828 A.2d 549 (Conn. 2003) (internal quotation marks and brackets omitted)).

The only individuals whom Plaintiff could perhaps argue are liable for recklessness are Defendants Street for neglecting the state of the cabinet doors, Defendants Collins and Ogando for failing to locate the incident report and photograph, and Naqvi for his medical treatment.

Plaintiff alleges that Street is responsible for ensuring the cabinet doors are secure and that it is well-known that "cabinet doors constantly fall off because most of the cabinets don[']t have doors." Am. Compl. ¶¶ 19, 44. These assertions are insufficient to infer a reckless state of consciousness. First, the lack of cabinet doors does not necessarily lead to the conclusion that

cabinet doors constantly fall off. The cabinet doors could have been removed, for example. Second, the Amended Complaint does not sufficiently allege Street was aware of the potential danger that cabinet doors posed, nor that a "high degree of danger" was apparent at all.

Plaintiff similarly fails to establish the requisite state of mind for Collins and Ogando. Defendants may have been careless when they failed to preserve and give Plaintiff a copy of the incident report and photographs of his original cabinet door wound. However, this does not seem to constitute an "extreme departure" from ordinary care—perhaps negligence, but not recklessness.

Plaintiff has, however, sufficiently alleged that Naqvi's conduct may meet the threshold for recklessness. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("[W]hile mere medical malpractice is not tantamount to deliberate indifference, certain instances of medical malpractice may rise to the level of deliberate indifference; namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted))). It is possible that Naqvi's failure to prescribe pain medication until ten months after Plaintiff's accident, despite Plaintiff's repeated notifications of his muscle pain and spasms, constitutes recklessness. Accordingly, Plaintiff's recklessness claim against Naqvi may proceed in relation to Count I. All other claims of recklessness and negligence are DISMISSED.

## C.    <u>Malpractice</u>

Similar to the Connecticut statutory bar to Plaintiff's negligence claims, state law also bars Plaintiff's malpractice claims. Section 4-160 requires authorization from the state Claims Commissioner to proceed. "In any claim alleging malpractice against the state, a state hospital or against a physician, surgeon, dentist, podiatrist, chiropractor or other licensed health care provider

employed by the state, the attorney or party filing the claim may submit a certificate of good faith to the Office of the Claims Commissioner in accordance with section 52-190a. If such a certificate is submitted, the Claims Commissioner shall authorize suit against the state on such claim." Conn. Gen. Stat. § 4-160(b). Plaintiff's Amended Complaint makes no mention of such certification. *See also Lockhart v. Semple*, No. 3:18-CV-1497 (JCH), 2018 WL 5828298, at *5 n.1 (D. Conn. 2018) ("To the extent [Plaintiff] seeks to raise a negligence or medical malpractice claim against Doe, his claim is barred by sections 4-160(b) and 4-165 of the Connecticut General Statutes. [Plaintiff] has not indicated whether he has obtained authorization from the state claims commissioner to sue a state official for medical malpractice."). Accordingly, any malpractice claim against Defendants is DISMISSED.

## D. Intentional and Negligent Infliction of Mental and Emotional Distress

Plaintiff asserts that Defendants inflicted upon him mental and emotional distress. As discussed *supra*, Conn. Gen. Stat. § 4-165(a) bars Plaintiff's negligence claims against Defendants. Accordingly, claims of negligent infliction of mental and emotional distress are dismissed as well. The Court turns to intentional infliction of mental and emotional distress.

In order to assert a claim for intentional infliction of emotional distress, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Miner v. Town of Cheshire*, 126 F. Supp. 2d 184, 194 (D. Conn. 2000) (quoting *Petyan v. Ellis*, 510 A.2d 1337, 1342 (Conn. 1986), *superseded by statute*; *see also Cavuoto v. Oxford Health Plans, Inc.*, No. 3:99-CV-00446 (EBB),

2000 WL 888263 at *8 (D. Conn. June 22, 2000); *DeLaurentis v. New Haven*, 597 A.2d 807, 827–28 (Conn. 1991). To be held liable for intentional infliction of emotional distress, one's conduct must be "so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind." *Miller*, 126 F. Supp. 2d at 194.

Plaintiff has not established any of the required elements. To the degree Plaintiff is claiming distress as a result of lack of treatment, the Court, in particular, does not find that any Defendants' actions were "extreme and outrageous," as those terms are interpreted at common law. The standard in Connecticut to demonstrate extreme and outrageous conduct is "stringent." *Huff v. W. Haven Bd. of Educ.*, 10 F. Supp. 2d 117, 122 (D. Conn. 1998). "[E]xtreme and outrageous" conduct is defined as that which "exceed[s] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *DeLaurentis*, 597 A.2d at 828 (Conn. 1991).

Whether conduct may be "reasonably regarded" as extreme and outrageous is a determination for the court. *Kintner v. Nidec-Torin Corp.*, 662 F. Supp. 112, 114 (D. Conn. 1987). Moreover, "[m]ere conclusory allegations are insufficient as a matter of law to support a cause of action for intentional infliction of emotional distress." *Huff*, 10 F. Supp. 2d at 122 (citing *Ruffolo v. Oppenheimer & Company, Inc.*, No. 90 Civ. 4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb. 5, 1991), *aff'd*, 949 F.2d 33 (2d Cir. 1991)).

Failure to act is not *affirmative* misconduct. Connecticut courts have held that a failure to act does not rise to the level of "extreme and outrageous behavior." *See, e.g., Germano v. Dzurenda*, No. 3:09CV1316 SRU, 2011 WL 1214435, at *21 (D. Conn. Mar. 28, 2011) (dismissing prisoner's

claim for intentional infliction of emotional distress for failure to state a claim where "there has been no allegation of affirmative misbehavior" by his defendant psychiatrists, only allegations that they "failed to take seriously [plaintiff prisoner's] threats of suicide"); *Giard v. Town of Putnam*, No. CV085002754S, 2008 WL 5481273, at *11 (Conn. Super. Ct. Dec. 3, 2008) (holding defendant school guidance counselor's conduct "could not, as a matter of law, be extreme and outrageous" because "[t]he alleged misconduct is the mere failure to act on unspecified information that the decedent was suicidal"). Accordingly, absent allegations of affirmative misconduct which is "extreme and outrageous," Plaintiff has failed to state a claim for intentional infliction of emotional distress against all Defendants.[12] All claims related to intentional and negligent infliction of mental and emotional distress are DISMISSED.

## V.  CONCLUSION AND ORDER

Pursuant to 28 U.S.C. § 1915A, the Court has reviewed the *pro se* prisoner's civil complaint to determine which, if any, claims must be dismissed for failure to state claims upon which relief may be granted and/or attempts to obtain monetary relief against a defendant who is immune from such relief.  Based on the foregoing, the Court sets forth its conclusion and Orders.

(1)  The Court DISMISSES all claims against Defendants Kathleen Maurer, John Street, Connie Weikopf, Mary Ellen Castro, Rikel Lightner, Monica Farinella, Alexis Gendall, Colleen Gallagher, Lt. Collins, and Tim Bombard.  The Clerk is directed to terminate these Defendants.

(2) All claims against the remaining Defendants in their *official* capacities are DISMISSED.

(3)  The following plausible claims against the individual defendants in their *personal*

---

[12] Plaintiff could have a plausible intentional infliction of emotional distress in connection to the strip search if he had suffered severe distress from the incident, but he has not alleged so.

capacities for damages may proceed:

> A. Retaliation against Ogando for a strip search without a penological purpose;
>
> B. Fourth Amendment violation against Ogando for said strip search;
>
> C. Deliberate indifference to serious medical needs against Naqvi regarding failure to treat Plaintiff's injuries stemming from a falling cabinet door; and
>
> D. Recklessness under state law against Naqvi for said failure to treat.

(5)   The Clerk shall verify the current work addresses for Naqvi and Ogando with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Amended Complaint to each Defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver requests on the **thirty-fifth (35) day** after mailing.  If any Defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on him/her, and he/she shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(6)   The Defendants shall file their response to the Amended Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above.  They may also include any and all additional defenses permitted by the Federal Rules.

(7)  Discovery, pursuant to Federal Rules of Civil Procedure 26 to 37 shall be completed within **six months (180 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(8)  All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

It is SO ORDERED.

Dated: New Haven, Connecticut
      December 6, 2018

                                    */s/ Charles S. Haight, Jr.*
                                    CHARLES S. HAIGHT, JR.
                                    Senior United States District Judge