# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CARVAUGHN JOHNSON,

      Plaintiff,

  v.

SYED JOHAR NAQVI and
CAPTAIN OGANDO,

      Defendants.

Civil Action No. 3:18-cv-694 (CSH)

**APRIL 29, 2021**

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Plaintiff Carvaughn Johnson ("Plaintiff") currently is incarcerated at MacDougall-Walker Correctional Institution ("MWCI") and filed a *pro se* Complaint pursuant to 42 U.S.C. § 1983 against twelve of the facility's employees.   Doc. 1 ("Compl.").   Plaintiff thereafter filed an Amended Complaint.   Doc. 6 ("Am. Compl.").

The Court then filed an Initial Review Order, in which it permitted four claims to proceed against two individuals in their personal capacities: (1) a claim of First Amendment retaliation against Captain Ogando ("Ogando") for a strip search that Ogando allegedly ordered without a penological purpose; (2) a Fourth Amendment violation against Ogando for the same strip search; (3) a claim of deliberate indifference to serious medical needs, in violation of the Eighth Amendment, against Dr. Syed Johar Naqvi ("Dr. Naqvi," and collectively with Ogando, "Defendants") regarding his failure to treat Plaintiff's injuries stemming from a falling cabinet door; and (4) a claim of recklessness under state law against Dr. Naqvi based on his failure to

treat Plaintiff.  *See Johnson v. Maurer*, No. 18 Civ. 694 (CSH), 2018 WL 6421059 (D. Conn. Dec. 6, 2018).

Defendants filed a motion for summary judgment, seeking to dismiss all of Plaintiff's claims.  Doc. 21 ("Mot."); Doc. 21-1 ("Defs.' Mem.").  Plaintiff opposes Defendants' motion in all respects.  Doc. 26, at 12–15 ("Pl.'s Mem.").  This Ruling resolves Defendants' motion.

## I.   BACKGROUND

The following facts are derived from the Parties' submissions.  Doc. 21-7 ("Defs.' 56(a)"); Doc. 26, at 1–11 ("Pl.'s 56(a)").  Unless otherwise noted, they are undisputed.

### A.   Medical Treatment

On May 21, 2017, Plaintiff saw Dr. Naqvi, complaining of foot pain.  Defs.' 56(a) ¶ 1. Dr. Naqvi prescribed Plaintiff Motrin, otherwise known as ibuprofen, a nonsteroidal anti-inflammatory drug (NSAID) that relieves pain and reduces inflammation.  *Id.* ¶ 2.[1]  Dr. Naqvi wrote the Motrin prescription for three months—from May 21, 2017 until August 21, 2017—and instructed Plaintiff to take one eight-hundred milligram pill of Motrin twice a day. *Id.* ¶ 4.

The Motrin prescription was a "keep on person" ("KOP") prescription, meaning that Plaintiff would be provided with a certain number of pills in a bottle to keep with him in his cell to take at regular intervals.  *Id.* ¶ 5.  According to Defendants, Plaintiff received regular supplies of Motrin on May 23, May 27, June 3, June 10, June 17, June 24, June 27, July 1, July 7, July 15, July 22, July 29, August 5, and August 12, 2017.  *Id.* ¶ 6.[2]

---

[1]  NSAIDs do not target a specific part of the body, but rather relieve pain to all portions of the body, meaning that if a patient took Motrin for a pain in one part of his body, it would still relieve pain to other parts of the body as well.  Defs.' 56(a) ¶ 3.

[2]  According to Plaintiff, Defendants' description of KOP prescriptions is misleading because medication distribution has recently changed to once every month.  Pl.'s 56(a), at 4 ¶ 6.  It is unclear, however, how this impacts Plaintiff's underlying access to medication.

Dr. Naqvi next saw Plaintiff on June 25, 2017, for complaints of shoulder pain and foot fungus.  *Id.* ¶ 7.  Dr. Naqvi did not order any additional pain medication for Plaintiff because he already was receiving Motrin regularly from the previous prescription.  *Id.* ¶ 8.  However, Dr. Naqvi did prescribe Plaintiff antifungal medication for his foot.  *Id.* ¶ 9.

Dr. Naqvi then saw Plaintiff on July 24, 2017 and treated Plaintiff's foot fungus and his complaints of shoulder and neck pain.  *Id.* ¶ 10.  Plaintiff's fungus had cleared up, but he reported that he had reduced range of motion in his neck.  *Id.* ¶ 11.  Dr. Naqvi therefore ordered c-spine x-rays, which were completed on July 25, 2017.  *Id.* ¶ 12.  The x-rays revealed no injuries to Plaintiff.  *Id.* ¶ 13.

Plaintiff received a new Motrin prescription from a nurse practitioner on August 14, 2017.  *Id.* ¶ 14. This prescription was for an additional three months—to expire in November 2017—and again Plaintiff was to take an eight-hundred milligram tablet of Motrin twice a day. *Id.* ¶ 15.  The prescription also was KOP.  *Id.* ¶ 16.[3]  Plaintiff received supplies of Motrin on August 17, August 26, September 2, September 9, September 16, September 23, September 30, October 7, October 14, October 21, October 28, November 4, and daily from November 11 to November 30, 2017.  *Id.* ¶ 17.

Dr. Naqvi next saw Plaintiff on August 27, 2017 and treated his complaints of neck and chest pain.  *Id.* ¶ 18.  Dr. Naqvi explained to Plaintiff that his previous x-rays were normal and revealed no injuries.  *Id.* ¶ 19.  According to Plaintiff, at the August 27 appointment, Plaintiff

---

[3]  Plaintiff objects to a number of the facts in Defendants' Rule 56(a) submission, arguing, for example, that the citations to which Defendants refer "ha[ve] nothing to [do] with the facts defendants are asserting."  Pl.'s 56(a), at 4 ¶¶ 14–16.  The Court construes Plaintiff's argument as a reference to Local Rule 56, which requires that "[e]ach material fact set forth in the Local Rule 56(a)1 Statement" must be "supported by the evidence."  D.Conn. Local R. 56.  However, contrary to Plaintiff's assertion, Defendants have made proper citations.  For example, Defendants claim that "Plaintiff received a new Motrin prescription from a nurse practitioner on August 14, 2017."  Defs.' 56(a)1 ¶ 14.  Defendants then cite to page 212 of Exhibit A to their motion (Plaintiff's medical records), which indicates that Plaintiff was, in fact, prescribed Motion on that day.  *See id.*  Defendants' other citations are proper for similar reasons.  Accordingly, the Court will not sustain an objection to the Defendants' facts on this basis.

also complained to Dr. Naqvi about his shoulder pain.  Pl.'s 56(a), at 4 ¶¶ 18–20.[4]

On that same day, Dr. Naqvi prescribed Plaintiff Elavil—otherwise known as amitriptyline—which is an antidepressant and can be used to treat anxiety, depression, tension, and can help patients sleep better.  Defs.' 56(a) ¶ 21.  Elavil can also be used to treat neuropathic pain, which is pain coming from damaged nerves, and Dr. Naqvi prescribed this medication to attempt to further address Plaintiff's complaints of pain.  *Id.* ¶ 22.  According to Plaintiff, however, Plaintiff repeatedly informed Dr. Naqvi that the Elavil did not reduce Plaintiff's pain—it only made Plaintiff sleepy.  Pl.'s 56(a), at 5 ¶ 22.  Dr. Naqvi wrote the Elavil prescription for three months and instructed Plaintiff to take one twenty-five milligram pill before bedtime.  Defs.' 56(a) ¶ 23.  According to Defendants, Plaintiff received Elavil daily from August 27, 2017 until April 17, 2018, *id.* ¶ 24, though according to Plaintiff, he stopped taking the medication because it "was not working," Pl.'s 56(a), at 5 ¶ 24.

Dr. Naqvi next saw Plaintiff on November 19, 2017 and treated his complaints of pain on the left side of his chest, in his neck, and right shoulder.  Defs.' 56(a) ¶ 25.[5]  Dr. Naqvi knew that Plaintiff had a prescription for Motrin at the time, but he renewed Plaintiff's prescription for Elavil in order to attempt to relieve Plaintiff's complaints of pain.  *Id.* ¶ 26.  Dr. Naqvi again wrote the Elavil prescription for three months and instructed Plaintiff to take one twenty-five milligram pill of Elavil before bedtime.  *Id.* ¶ 27.  Prior this prescription's expiration, a nurse practitioner increased the dosage to fifty milligrams and extended it until May 2018.  *Id.* ¶ 28.

---

[4]   Despite Plaintiff's claim that he complained to Dr. Naqvi about his shoulder pain on August 27, 2017, Dr. Naqvi's notes from that appointment do not reflect any such discussion.  Pl.'s Med. Records at 212.  This stands in contrast to Plaintiff's June 25, 2017 appointment with Dr. Naqvi, for example, where there is a notation regarding shoulder pain.  *See id.*

[5]   Plaintiff claims that Defendants' assertions are misleading.  Pl.'s 56(a), at 5 ¶ 25.  Rather than explaining why Defendants' assertions are misleading, however, Plaintiff merely cites to various Inmate Request Forms that he attached to his opposition to Defendants' motion.  *Id.*  It is not clear from Plaintiff's citations why Defendants' assertions are misleading.

Plaintiff disputes Defendants' assertions regarding his Elavil prescription.   According to Plaintiff, at some point he stopped showing up to pick up his medication—and stopped taking the medication altogether—because it did not reduce his pain.   Pl.'s 56(a), at 5 ¶¶ 24, 26, 30. Plaintiff also claims that he repeatedly requested to stop being prescribed Elavil, and that on multiple occasions he complained to Dr. Naqvi about this pain and the ineffectiveness of Elavil. *Id.* at 5 ¶ 25.   Lastly, Plaintiff claims that he continues to have pain and spasms to this day.   *Id.* at 5 ¶ 30.

Dr. Naqvi recommended that Plaintiff have a consultation with an orthopedic specialist for his shoulder.   Defs.' 56(a) ¶ 29.   Plaintiff saw the specialist on February 16, 2018, who concluded that:

> [Plaintiff] is a 35-year-old male with right shoulder pain.   He has no concerning findings on x-ray examination today.   It is possible that his right shoulder pain is secondary to some residual myofascial inflammation from his previously reported history of minor trauma.   As such, we have recommended that he take over-the-counter NSAIDs including Motrin and naproxen as needed for pain.   We also demonstrated different stretching and strengthening exercises for the right shoulder that the patient could do and recommended that he utilize ice or heat as needed for pain as well. Otherwise, he has no restrictions and he does not require further orthopedic followup.

*Id.* ¶ 30.

On March 11, 2018, Dr. Naqvi prescribed Plaintiff naproxen to help address his complaints of pain.   *Id.* ¶ 31.   Plaintiff was to take one five-hundred milligram pill of naproxen twice a day for three months.   *Id.* ¶ 32.

On March 29, 2018, Dr. Naqvi saw Plaintiff for his complaints of shoulder pain and his request for bigger sneakers.   *Id.* ¶ 33.   Dr. Naqvi discontinued Plaintiff's previous naproxen prescription and prescribed him Motrin.   *Id.* ¶ 34.   Plaintiff was to take one eight-hundred

milligram pill of Motrin twice a day for three months.  *Id.* ¶ 35.

Dr. Naqvi continued to treat Plaintiff for a variety of medical complaints, including shoulder pain, beyond March 2018.  *Id.* ¶ 36.  According to Plaintiff, he continued to report to Dr. Naqvi that he still was experiencing pain.  Pl.'s 56(a), at 5 ¶ 36.  Dr. Naqvi also recommended that Plaintiff receive a steroid injection to reduce inflammation in his shoulder in order to alleviate his pain.  Defs.' 56(a) ¶ 37.  Plaintiff received this shot in November 2018. *Id.* ¶ 38.

The Parties dispute whether Dr. Naqvi received any medical correspondence from Plaintiff from May 2017 to April 2018.  According to Defendants, Dr. Naqvi did not receive or read any medical requests, complaints, or other correspondence from Plaintiff during that period because DOC doctors do not typically receive such requests.  *Id.* at 39.  Inmate medical requests and complaints, according to Defendants, are processed by nursing staff, and the inmate is then placed on a sick call list to see a medical doctor or nurse practitioner.  *Id.* ¶ 40.

Plaintiff claims, in contrast, that Plaintiff wrote numerous medical requests that were addressed to Dr. Naqvi.  Pl.'s 56(a), at 6 ¶ 39.  Plaintiff also claims that Defendants' description of the inmate request procedure—that the nursing staff handle all requests and place inmates on a doctor's sick call list—is not completely accurate; Plaintiff claims that Dr. Naqvi also can instruct the medical staff to place patients on a list to see him.  *Id.* at 6 ¶ 40.

## B.    Settlement Agreement and Release of Claims

On February 8, 2018, Plaintiff signed a settlement agreement in connection with a different lawsuit in this Court.  Defs.' 56(a) ¶ 41.  That lawsuit was captioned *Johnson v.*

*Trestman*, No. 14 Civ. 856 (SRU).[6]  *Id.*  Among other terms in the agreement, Plaintiff agreed to the following:

> [R]elease and forever discharge . . . all other present and former officers, officials, representatives and employees of the State of Connecticut, their heirs, successors and assigns, from all actions, causes of action, suits, claims, or controversies, whether in law or equity, whether foreseen or unforeseen, whether known or unknown, whether accrued or not accrued, and of and from all direct or indirect claims, debts, damages and demands of every nature and kind, including attorneys' fees and costs, monetary and equitable relief, which the Plaintiff, his heirs, successors and assigns ever had or now have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world up to the date of this Agreement only . . . including such actions as may have been or may in the future be brought in the federal courts.

*Id.* ¶ 42.

## C.   Strip Search

On July 29, 2018, Ogando was on duty at MCWI.  *Id.* ¶ 43.  At approximately 11:20 a.m., inmate kitchen workers were returning to their assigned units for the 11:45 a.m. Facility Formal count.  *Id.* ¶ 44.  At approximately 11:20 a.m., Ogando directed custody staff to report to the kitchen block (L-Pod vestibule) to conduct random strip searches of the inmate kitchen workers.  *Id.* ¶ 45.  The L-pod vestibule was chosen because it would serve as a checkpoint for the inmates before returning from work and entering their housing units.  *Id.* ¶ 46.

Ogando ordered the strip searches because there were consistent and frequent reports of items missing from the kitchen.  *Id.* ¶ 47.[7]  Ogando knew from his years of training and experience that the removal of items from the kitchen can cause security problems because it can

---

[6]  In connection with that lawsuit, Plaintiff brought an Eighth Amendment claim for deliberate indifference to mental health needs as well as state law claims.  *See Johnson v. Trestman*, No. 14 Civ. 856 (SRU), Initial Review Order, Doc. 5, at 7 (D. Conn. Nov. 17, 2014).

[7]  According to Plaintiff, Defendants' assertions are misleading.  Plaintiff claims that if items were missing from the kitchen, inmates would be strip searched *before* leaving the kitchen area.  Pl.'s 56(a), at 6 ¶ 47.  On the other

lead to inmates selling or trading food, or even lead to the introduction into the housing units of weapons such as knives. *Id.* ¶ 48. According to Defendants, Ogando therefore ordered the strip searches of all inmates returning from work for the purpose of finding any weapons or other concealed contraband. *Id.* ¶ 49.

Plaintiff was one of the inmates who was strip searched, but disputes that Ogando ordered the strip search of *all* inmates. Specifically, at approximately 11:20 a.m., Plaintiff was returning from his work assignment as a hospital janitor at MCWI's hospital unit along with the inmate kitchen workers. *Id.* ¶ 50. Plaintiff was given the same directions as the inmate kitchen workers. *Id.* ¶ 51. Plaintiff indicated that he was not a kitchen worker, but he complied with staff directions. *Id.* ¶ 58.

Ogando ordered that Plaintiff be searched as well because he knew that Plaintiff was returning from work at MCWI's hospital unit, from which potentially dangerous items could be smuggled that could pose a safety risk to the prison community. *Id.* ¶¶ 52–54. But Plaintiff claims that he was the *only* inmate who worked at the hospital who was strip searched, out of the four inmates who were returning from hospital jobs that day—that is, Plaintiff disputes that Ogando ordered the strip search of all inmates returning from jobs. Pl.'s 56(a), at 6 ¶¶ 49–51.

The Parties dispute Ogando's underlying motivation behind ordering the strip search of Plaintiff. According to Defendants, Ogando was concerned that Plaintiff was leaving a work area from which he could hide or smuggle contraband, and he therefore directed that Plaintiff also be searched along with the kitchen workers. Defs.' 56(a) ¶¶ 55–56. Plaintiff disputes this, arguing that Ogando could not have been genuinely worried that Plaintiff was leaving a work area from which he could hide or smuggle contraband because he only ordered a strip search of

---

hand, if items were missing from any area in the facility, the prison would be placed on lockdown per security protocol. *Id.*

Plaintiff and not the other hospital workers.  Pl.'s 56(a), at 7 ¶ 55.  Instead, according to Plaintiff, Ogando that day remarked to Plaintiff that he was being strip searched *since you like to file lawsuits.*"  *Id.* at 7 ¶ 56 (emphasis added).

The Parties further dispute the location of the search and, specifically, whether Plaintiff was searched in a private room.  According to Defendants, Plaintiff was directed to go to a private area for a search.  Defs.' 56(a) ¶ 57.  Defendants claim that along with twelve to fifteen other inmates who were strip searched before they reentered their housing units on July 29, 2018, Plaintiff's strip search was conducted in the L-pod vestibule.  *Id.* at ¶¶ 58–60.  The searches took place in the L-pod vestibule, according to Defendants, because it contains multiple private offices and ensures the privacy of the inmates being searched.  *Id.* ¶ 61.  Plaintiff disputes these claims regarding the privacy of the room where he was searched.  According to Plaintiff, he was strip searched in a room "that wasn't private at all."  Pl.'s 56(a), at 7 ¶ 57.  Rather, the search took place "in the second room to your left when you walk into" the L-pod vestibule, which is a "room used for [l]egal [c]alls" and has "no privacy whatsoever" because it has two big windows and an additional smaller window in the door.  *Id.*

The Parties also dispute the extent to which Ogando oversaw Plaintiff's strip search.  According to Defendants, Ogando did not personally observe every strip search conducted that day, nor did he personally search or observe the search of Plaintiff.  Defs.' 56(a) ¶ 62.  Plaintiff claims, in contrast, that Ogando looked into the room while Plaintiff was being strip search several times to see if Plaintiff was complying.  Pl.'s 56(a), at 8 ¶ 62.

Additionally, the Parties dispute whether Ogando was violating DOC protocol in connection with Plaintiff's strip search.  According to Defendants, Ogando had no reason to believe that the search of Plaintiff violated established protocol in any way.  Defs.' 56(a) ¶ 63.

They claim that Plaintiff was strip searched in the same manner as the other inmate workers: per protocol and in keeping with DOC's Administrative Directive 6.7.  *Id.* ¶ 64.   Plaintiff asserts, in contrast, that Ogando's actions violated prison policy because they were motivated by retaliation, and that Ogando intentionally singled out Plaintiff for a strip search out of all of the inmates returning from the hospital unit that day.  Pl.'s 56(a), at 8 ¶ 63–64.

Lastly, the Parties dispute whether Plaintiff complained about the search when it was underway.   Defendants claim that at the time of the search, Plaintiff did not report any issues or objections to Ogando regarding the manner in which the strip search was conducted.   Defs.' 56(a) ¶ 65.   On the other hand, Plaintiff asserts that he did object and asked Ogando why he was being strip searched because he had nothing to do with the kitchen workers, to which Ogando responded—as mentioned *supra*—that Plaintiff was being searched "since you like filing lawsuits."  Pl.'s 56(a), at 8 ¶ 65.

## II.   **STANDARD OF REVIEW**

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *see also Redd v. New York Div. of Parole*, 678 F.3d 166, 173–74 (2d Cir. 2012). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A fact is "material" if it "might affect the outcome of the suit under governing law."  *Id.*

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex v. Catrett*, 477 U.S. 317, 323 (1986).   If the initial burden is satisfied, the burden then shifts to the nonmoving party to present "specific evidence demonstrating the existence of a genuine dispute of material fact."  *Robinson v. Concentra*

*Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks and citation omitted). While the Court must view the record in the light most favorable to the nonmoving party, and resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see Anderson*, 477 U.S. at 255, the nonmoving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must support each assertion disputing the veracity of a fact or existence of an alleged dispute with specific citation to the evidentiary record. *See* Fed. R. Civ. P. 56(c)(1).

Because Plaintiff is proceeding *pro se*, the Court must read his submissions "liberally" and interpret them "to raise the strongest arguments" that they suggest. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). Nonetheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (internal quotation marks omitted).

## III.   <u>DISCUSSION</u>

As the Court explained in its Initial Review Order, Plaintiff's remaining claims in this lawsuit are: (1) retaliation against Ogando for a strip search without a penological purpose; (2) a Fourth Amendment violation against Ogando for the same strip search; (3) deliberate indifference to serious medical needs against Dr. Naqvi regarding his failure to treat Plaintiff's injuries stemming from a falling cabinet door; and (4) recklessness under state law against Dr. Naqvi based on his failure to treat Plaintiff. The Court will address these claims in order.

A.      **Strip Search**

1.      **Retaliation**

Plaintiff brings a claim for retaliation against Ogando on the basis that Ogando ordered a strip search of Plaintiff in retribution for Plaintiff's filing of lawsuits against DOC officials. *See* Am. Compl. ¶ 72.

It is well settled that inmates "have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). "[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation and internal quotation marks omitted). Even where a plaintiff has adduced sufficient evidence to satisfy each element of a retaliation claim, a defendant can still defeat the retaliation claim:

> If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct. Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citation and internal quotation marks omitted).

"Because retaliation claims are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts. Conclusory allegations of retaliatory conduct are not sufficient." *Green v. Tavernier*, No. 18 Civ. 1781 (CSH), 2019 WL

2015849, at *3 (D. Conn. May 7, 2019) (citing *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)).

There is no dispute that Plaintiff's filing of a lawsuit constitutes protected activity. *See Shand v. Parsons*, No. 20 Civ. 28 (CSH), 2020 WL 1989151, at *6 (D. Conn. Apr. 27, 2020) ("Protected speech or activity includes, for example, filing a lawsuit, an administrative complaint, or a prison grievance." (citing *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019)). However, the Parties dispute the second and third prongs of Plaintiff's retaliation claim.

The Court will now turn to the second prong: whether Ogando's conduct constituted an adverse action.

An adverse action, as used in the second prong of a retaliation claim, refers to "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citation and internal quotation marks omitted). This is an "objective test" that "applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381 (citing *Davis*, 320 F.3d at 353).

Defendants' only argument in support of their claim that Ogando's conduct did not constitute an adverse action is that the "search was conducted in a reasonable and lawful manner." Defs.' Mem. at 25. According to Defendants, "such a routine and normal incident could not possibly deter a similarly situated individual of ordinary firmness from exercising his constitutional rights." *Id.* (internal quotation marks and citation omitted). Plaintiff does not overtly address the issue in his brief.

Whether a strip search constitutes an adverse action for purposes of a retaliation claim has not been addressed by many courts in this circuit. Courts have more frequently addressed

other types of searches, such as inmates' cell searches, which generally do not rise to the level of an adverse action. *See, e.g.*, *Joseph v. Annucci*, No. 18 Civ. 7197 (NSR), 2020 WL 409744, at *5 (S.D.N.Y. Jan. 23, 2020) ("Plaintiff has failed to state a claim for relief because cell searches and pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim." (collecting cases; citation and internal quotation marks omitted)). Similarly, courts have ruled that pat frisks do not constitute adverse actions. *See, e.g.*, *Henry v. Annetts*, No. 08 Civ. 286 (LAP), 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010) ("[P]at frisks are an ordinary part of prison life and would not (and do not) deter the average inmate from continuing to exercise his First Amendment rights.").

Strip searches in the retaliation context were briefly addressed in *Lipton v. Cty. of Orange, NY*, 315 F. Supp. 2d 434, 444 (S.D.N.Y. 2004). In that case, the plaintiff—who previously had been an outspoken critic of the police department in the media—was temporarily transferred from a county jail to the jail on Riker's Island. *See id.* at 443–44. When the plaintiff was being transported back to the county jail because he was being released on bail, a county police officer ordered that the plaintiff undergo a strip search. *See id.* The plaintiff asked the officer why he was being searched, given that he had been in the custody of other officers during the transport. *See id.* at 444. The officer responded, "I hear you tape record cops. You give cops a hard time," which the plaintiff claimed was evidence of retaliation. *Id.* (internal quotation marks omitted). Although the court ultimately granted the defendants' motion for summary judgment on other grounds—specifically, the plaintiff had not proffered any evidence that the search resulted from a county custom or policy (for purposes of municipal liability) or that any named defendant had personal involvement in the search—the court still opined on the inappropriateness of the search:

> We treat plaintiff's claims with respect to the alleged pre-release strip search separately because, viewed in the light most favorable to plaintiff, those allegations present an appalling abuse of the power afforded to corrections officers that is too serious an affront to a decent society to dismiss solely on the basis of a briefing failure, without a review of their merit.

*Id.* at 446.

More recently, retaliatory strip searches were addressed in *Pizarro v. Bd. of Correction*, No. 16 Civ. 2418 (RJS), 2018 WL 3462512 (S.D.N.Y. July 17, 2018), a case that Defendants cite. In that case, District Judge Richard Sullivan (as he then was) concluded that an officer's strip search of an inmate did not qualify as an adverse action. *See id.* at *6. Judge Sullivan cited the United States Supreme Court's holding in *Hudson v. Palmer*, 468 U.S. 517 (1984), in which the court held that "wholly random searches are essential to the effective security of penal institutions" and therefore do not violate prison inmates' Fourth Amendment rights. *Id.* at 529. Judge Sullivan also relied upon the principle, articulated in *Florence*, 566 U.S. 318, that courts must defer to prison officials in the formulation of search procedures. *See Pizarro*, 2018 WL 3462512, at *6. With that guidance in mind, Judge Sullivan reasoned that the plaintiff presented no evidence demonstrating "why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights." *Id.* The court added that "Plaintiff plead[ed] no facts indicating that the . . . officer singled out Plaintiff for strip searching; in fact, Plaintiff admit[ed] that his whole housing unit underwent strip searches." *Id.*[8]

Turning to the case at bar, the Court concludes that the strip search at issue could deter a typical prisoner from exercising his or her First Amendment rights. A strip search is

---

[8]   *In Pizarro*, Judge Sullivan adopted Judge Furman's analysis in *Israel v. City of New York*, No. 11 Civ. 7726 (JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct. 5, 2012), in support of his conclusion that a routine and ordinarily lawful strip search would not deter a typical prisoner from exercising his or her First Amendment rights. *See Pizarro*, 2018 WL 3462512, at *6. Judge Furman's analysis in *Israel* involved allegations that a strip search violated a plaintiff's Fourth Amendment right to privacy, not an inmate's First Amendment right to file lawsuits and grievances without retribution. Therefore, the *Israel* case is less relevant to this particular section of this Ruling. However, Plaintiff's Fourth Amendment claim is discussed *infra*.

significantly more invasive than a cell search or a pat frisk. *See Harris*, 818 F.3d at 58. That is particularly the case when windows permit other officers and inmates to view the inmate's exposed body, as Plaintiff alleges occurred in the case are bar. *See id*. at 62. Although this might not be determinative in the Fourth Amendment context where the reasonableness of the search is in question, *see Green v. Martin*, 224 F. Supp. 3d 154, 164 (D. Conn. 2016) ("Numerous district courts in this Circuit have held that accusations of humiliation and embarrassment caused by strip searches, on their own, do not state a claim under the Fourth Amendment." (collecting cases)), the Court undertakes a different inquiry when it evaluates, as it must in this case, whether an inmate subjected to a strip search may be objectively deterred from affirmatively exercising his or her rights.

Additionally, the underpinnings of Judge Sullivan's analysis in *Pizarro* are not present in this case. The court there found that the strip search was routine and ordinary, and the plaintiff was not singled out. *See Pizarro*, 2018 WL 3462512, at *6. In contrast, Plaintiff here has provided evidence that this search was neither routine nor ordinary; rather, according to Ogando's alleged admission, Ogando selected Plaintiff for a strip search because Plaintiff had previously filed a lawsuit against DOC officials. It is one thing for an inmate to know that he or she might be subject to regular searches as an incident to daily life in prison, but it is quite different if an inmate suspects that his or her mere filing of a lawsuit could subject the individual to a public strip search, for no reason whatsoever aside from a prison official's vindictive animus. Such retaliatory behavior exemplifies the type of "appalling abuse of the power afforded to corrections officers that is too serious an affront to a decent society," and an individual might be deterred from exercising his or her constitutional rights under those circumstances. *Lipton*, 315 F. Supp. 2d at 444. Accordingly, Plaintiff has satisfied the adverse

16

action prong of his retaliation claim for purposes of this motion.[9]

The Court now turns to the third prong of the retaliation analysis: whether there was a causal connection between Plaintiff's filing of a lawsuit and the subsequent strip search.

In support of their motion for summary judgment, Defendants assert that Ogando's actions could not be causally related to Plaintiff's filing of a lawsuit because Ogando was unaware that Plaintiff had previously filed the *Johnson v. Trestman*, No. 14 Civ. 856 (SRU) action in this Court. Defs.' Mem. at 25. According to Defendants, Ogando "was not aware of [the lawsuit's] existence or the nature of the complaints contained therein." *Id.*

On the other hand, Plaintiff disputes that Ogando was unaware of Plaintiff's previous lawsuit. In particular, Plaintiff claims that Ogando remarked to Plaintiff that he was being strip searched "since you like to file lawsuits." *See Johnson*, 2018 WL 6421059, at *13. Additionally, Plaintiff claims that Ogando was aware of the previous lawsuit because he singled Plaintiff out for a strip search, out of the four inmates who were returning from the health unit. *See id.*[10]

To satisfy the causation prong of a retaliation claim, "allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (citation and internal quotation marks omitted). "Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct

---

[9] Defendants also argue that the search was "conducted in a reasonable and lawful manner" and therefore it could not deter any individual from exercising his or her rights. Defs.' Mem. at 25. However, as the Court discusses *infra* in connection with Plaintiff's Fourth Amendment claim, Plaintiff has raised a triable issue regarding the reasonableness of the strip search. Accordingly, this argument does not alter the Court's adverse action analysis.

[10] Plaintiff also claims that all departments at DOC are informed via email of an inmate's lawsuit either by the Commissioner or the Attorney General's Office. Pl.'s 56(a), at 8 ¶ 66. Plaintiff additionally claims that Ogando at one point had boasted about being the Shift Commander—who is the individual in charge of investigations—"so how could he not know plaintiff filed a previous action." *Id.* at 9 ¶ 66. These latter claims, aside from being speculative, do not support an argument that Ogando had personal knowledge of Plaintiff's previously-filed lawsuits.

and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 18 Civ. 1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019) (citation omitted).

The Parties do not address the first three factors, but Plaintiff argues that the alleged statement made by Ogando reflects Ogando's true motive for the search: to retaliate against Plaintiff because he had previously filed a lawsuit against prison officials. The Court agrees. Particularly because of the apparent nexus between the content of the alleged comment and the strip search itself—"since you like to file lawsuits you [are] getting strip searched to[o]"—a rational juror could conclude that Ogando's actual reason for the search order was to retaliate against Plaintiff. Pl.'s 56(a), at 7 ¶ 56; *see also Shepherd v. Fisher*, No. 08 Civ. 9297 (RA), 2017 WL 666213, at *19 (S.D.N.Y. Feb. 16, 2017) (denying summary judgment on the plaintiff's retaliation claim and concluding that a reasonable factfinder could infer a causal relationship between the plaintiff's prior complaints about the defendant and the adverse action because the defendant "expressly linked" the two in statements made to the plaintiff); *Cole v. New York State Dep't of Corr. & Cmty. Supervision*, No. 14 Civ. 539 (BKS) (DEP), 2016 WL 5394752, at *26 (N.D.N.Y. Aug. 25, 2016), *report and recommendation adopted*, 2016 WL 5374125 (N.D.N.Y. Sept. 26, 2016) (an inmate raised genuine issues of material fact concerning the causation element of a retaliation claim in a case involving an alleged assault, because during the assault the defendant allegedly referenced prior assaults and a lawsuit that resulted from those assaults, as well as commented that the assault was "payback" for the plaintiff=s grievances); *Bilal v. New York State Dep't of Corr.*, No. 09 Civ. 8433 (JSR) (AJP), 2010 WL 2506988, at *15 (S.D.N.Y. June 21, 2010) (although granting the defendants' motion for

18

summary judgment, concluding nonetheless that the plaintiff had satisfied the causation prong of a retaliation claim because during three alleged incidents, "an officer specifically commented about [the plaintiff's] filing of grievances"), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012).[11]

Defendants nonetheless make a number of arguments in support of their contention that Ogando did not retaliate against Plaintiff. For example, Defendants claim that Ogando could not have retaliated against Plaintiff because Ogando was not named in Plaintiff's prior lawsuit. Defs.' Mem. at 25. According to Defendants, "the mere fact that Plaintiff filed a complaint against third parties is simply too thin and speculative to satisfy the causal element of a retaliation claim." *Id.*[12]

This argument is not persuasive. As Defendants contend, generally it is "difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, No. 09 Civ. 3135 (RWS), 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011). But "there is no *per se* rule of law standing for the proposition that a retaliation claim may only be sustained against individual defendants against whom grievances were filed." *Alston v.*

---

[11] Of course, the jury may ultimately conclude that Plaintiff's testimony regarding Ogando's remark is not credible. But that assessment is for the trier of fact—not this Court on a motion for summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

[12] When Plaintiff initially filed the instant lawsuit, he claimed that Ogando was a party to the *Johnson v. Trestman*, No. 14 Civ. 856 (SRU) action in this Court. After reviewing Defendants' motion for summary judgment, however, Plaintiff submitted to the Court a "Judicial Notice," in which he sought to withdraw this assertion. Doc. 28 ("Pl.'s Jud. Not."). According to Plaintiff, he "made a mistake/error when he filed his grievance by stating that plaintiff was retaliated against by defendant Ogando for filing a lawsuit against him (defendant Ogando)." *Id.* at 1 (internal quotation marks omitted). Plaintiff further explained that he "had not filed a lawsuit against defendant Ogando at that time, he had only filed the Civil Action No. 3:14-cv-856 (SRU) and plaintiff made an error by saying he filed a lawsuit against defendant Ogando which had not occurred yet (at the time of the grievance)." *Id.* Plaintiff requests that the Court "take notice of his error" and stresses that "he is not a lawyer, doesn't have any legal training, has no access to research and very limited access to the prison library—once per week." *Id.* The Court appreciates Plaintiff's efforts to correct the record. For the reasons stated herein, though, whether Ogando was a party to Plaintiff's previous lawsuit, or not, does not affect the Court's analysis because there is still a triable fact regarding Ogando's knowledge of the previous lawsuit, which is sufficient for purposes of a retaliation claim.

*Bellerose*, No. 12 Civ. 147 (CSH), 2015 WL 4487973, at *9 (D. Conn. July 23, 2015) (citation omitted).

Further, the Second Circuit rejected a similar argument in *Espinal v. Goord*, 558 F.3d 119 (2d Cir. 2009).  In *Espinal*, prison officials allegedly used excessive force against the plaintiff and denied him medical treatment in violation of the Eighth Amendment in retaliation for the plaintiff's prior lawsuits.  *See id.* at 120–21.  One of the defendants had not been named in the plaintiff's previous lawsuits—the defendant had allegedly only heard of the lawsuit from his colleagues—and retaliated against the plaintiff thereafter.  *See id.* at 129–30.  The court of appeals did not find this distinction conclusive, however, and held that it could nonetheless *infer* that the defendant who was unnamed in the previous lawsuit had knowledge of the lawsuit, under the circumstances.  *See id.*  In ruling that summary judgment should not have been awarded to the defendants on the plaintiff's retaliation claim, the Second Circuit explained:

> [W]e cannot conclude that there is no evidence that [the defendant who was not named in the prior lawsuit] was aware of [the plaintiff's] prior lawsuit.  Viewing the evidence in the light most favorable to [the plaintiff], as we must, it is a legitimate inference that [the defendant], as a member of [the prison's] emergency response team with Surber . . . learned of the prior lawsuit from Surber, who was a defendant in the earlier lawsuit, or from other officers aware of the lawsuit, and took action in response to [the plaintiff's] protected activity.

*Id.*; *see also Barrington v. New York*, 806 F. Supp. 2d 730, 749–50 (S.D.N.Y. 2011) (inferring that correctional officers had knowledge of the plaintiff's prior grievance—even though they had not been named in the prior grievance—because both the named and unnamed officers were present together at the alleged retaliation for the grievance (citing *Espinal*, 558 F.3d at 130)); *cf. Alston*, 2015 WL 4487973, at *9 (concluding that a plaintiff stated a claim for retaliation because his "allegations support[ed] the inference that the named Defendants . . . were generally aware of

Plaintiff's participation in a protected activity," even though they were not named in the plaintiff's prior lawsuit, because other officers allegedly made statements to them regarding the plaintiff's "litigiousness").

Guided by these precedents, the Court reverts to the causation inquiry in the case at bar. Similar to *Espinal*, the Court cannot conclude that there is no evidence that Ogando was aware of Plaintiff's prior lawsuit. Viewing the evidence in a light most favorable to Plaintiff, a reasonable juror could infer on the basis of Ogando's alleged comment to Plaintiff that Ogando learned of Plaintiff's previous lawsuit from other officers who were aware of the lawsuit, and took action—ordering Plaintiff's strip search—in response to Plaintiff's protected activity. The fact that Ogando ordered a strip search of Plaintiff, who was the only inmate returning from the health unit who was singled out, is additional, circumstantial evidence from which a juror could conclude that a causal connection existed sufficient for a claim of retaliation.

Defendants cite to a number of cases in support of their argument that Ogando could not have retaliated against Plaintiff because he was not named in the previous lawsuit, but they are distinguishable. For example, in *Jones v. Fischer*, No. 10 Civ. 1331 (GLS) (ATB), 2013 WL 5441353 (N.D.N.Y. Sept. 27, 2013), the court concluded that the plaintiff had not established a nexus between his protected activity of filing a grievance against a prison official and the alleged retaliation of filing a misbehavior report against the plaintiff. *See id.* at 20. In that case, the plaintiff submitted a grievance against one official, but alleged that a separate official (who was not named in the grievance) retaliated against plaintiff. *See id.* The official who allegedly retaliated against the plaintiff had been serving as acting captain, and he was assigned to review the mail of the captain who was on leave. *See id.* at 21. The plaintiff alleged that the acting captain read the grievance that the plaintiff had submitted, in connection with his mail-reviewing

duties. *See id.*   The court rejected this argument as speculation, concluding that it was "unclear how . . . [the defendant] would have become aware of plaintiff's grievance against" a different officer.  *Id.*

*Jones* is distinguishable because it was not clear that the defendant was actually aware of the plaintiff's grievance regarding another officer.  The court did not state, as a matter of law, that the defendant could not have retaliated against the plaintiff because the defendant was not named in the plaintiff's lawsuit.  In contrast, in the case at bar, there is evidence of Ogando's awareness of Plaintiff's lawsuit.[13]

Defendants ague, in the alternative, that Ogando did not retaliate against Plaintiff because Ogando did not become aware of the *instant* lawsuit until several months after the strip search. *See* Defs.' Mem. at 26.   According to Defendants, Plaintiff filed an Amended Complaint in this action on October 9, 2018, the Court issued its IRO on December 6, 2018, and Ogando was only sent a waiver of service alerting him to the existence of this case on March 21, 2019, about eight months after the adverse action.   *Id.* (citations omitted); *see also* Defs.' Reply at 8.

The Court agrees that there is no basis to find a causal connection between Plaintiff's filing of this lawsuit and Ogando's act of retaliation.   It is undisputed that Ogando was not served with the Complaint in the case at bar until 2019—after the strip search took place.   Defs.' 56(a) ¶ 68.   *See, e.g., Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir. 1996) ("Clearly, [a plaintiff] may not base her claim of retaliation upon complained-of acts that predated her [protected

---

[13]   Defendants' citation to *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) also is distinguishable. The court in that case concluded that, "even assuming that [the defendant] knew about [the plaintiff's] grievance against [a separate defendant], he has failed to provide any basis to believe that [the unnamed defendant] retaliated for a grievance that she was not personally named in."  *Id.* at 369.   The court further explained that, unlike the Second Circuit's ruling in *Espinal*, the defendant had not made any "statement evincing [a] retaliatory intent"—such as the *Espinal* defendant's statement that "this is what happens to inmates when they submit law suits against us"—and therefore the court in *Roseboro* was unable to make a "legitimate inference" that the defendant "retaliated for a grievance she was not named in."  *Id.* at 369 n.23 (internal quotation marks omitted).   In contrast, in the case

activity].").   However, that does not alter the Court's conclusion that there is a disputed fact regarding Ogando's knowledge of Plaintiff's prior lawsuit, and that a rational juror could conclude that a causal connection existed between Ogando's alleged adverse action and Plaintiff's filing of lawsuits.

The question remains whether Defendants have shown by a preponderance of the evidence that they would have disciplined Plaintiff even in the absence of the protected conduct. *See Graham*, 89 F.3d at 79.   As discussed *supra*, if Plaintiff was strip searched "for both proper and improper reasons," the conduct "may be upheld if the action would have been taken based on the proper reasons alone." *Id.*   The Parties do not address this question in their briefs, but it is possible to infer potential arguments.

For example, Defendants contend that Ogando ordered the search due to concerns over the smuggling of contraband. *See* Defs.' Mem. at 25.   According to Defendants, Plaintiff was returning from work at the hospital unit where he had access to a number of items that could harm members of the prison community, and Ogando's "years of experience ha[d] taught him" that Plaintiff could have smuggled such items into the housing unit. *See id.* at 25–26. Following this argument to its logical end, Defendants could maintain that Ogando would have ordered the search *regardless* of Plaintiff's prior participation in protected activity.

Plaintiff, in turn, could make similar arguments that the Court addressed *supra*.   That is, he could argue that Ogando was not actually concerned that Plaintiff had smuggled weapons and other potentially-harmful medical devices out of the health unit; if Ogando had been concerned, then he would have not singled Plaintiff out—he would have ordered a search of all four inmates who returned from the health unit.   Additionally, Plaintiff could once again cite to Ogando's

---

at bar and, as noted *supra*, Ogando *did* make the type of statement evincing a retaliatory intent contemplated by *Espinal*.   Defendants' other citations fare no better for similar reasons. *See* Defs.' Mem. at 25 n.2.

comment that Plaintiff was being strip searched because he liked filing lawsuits.

The Court concludes that Plaintiff has raised a triable issue with respect to Ogando's motivations. Defendants ultimately bear the burden of showing by a preponderance of the evidence that Ogando ordered the search of Plaintiff for a proper purpose. *See Graham*, 89 F.3d at 79. Plaintiff has put forward enough evidence to raise a genuine dispute regarding the validity of that stated purpose.

Defendants lastly argue, in their reply brief, that Plaintiff's opposition runs afoul of this District's local rules, which require that:

> Each statement of material fact by a movant in a Local Rule 56(a)1 Statement or by an opponent in a Local Rule 56(a)2 Statement, and each denial in an opponent's Local Rule 56(a)2 Statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial.

D. Conn. Local Civ. R. 56(a)(3). According to Defendants, Plaintiff has failed to include in his Rule 56(a) statement the proper citations to admissible evidence. Defs.' Reply at 8.[14]

It is true that, "*[p]ro se* parties and represented parties alike must comply with this District's requirements for motions for summary judgment; if they do not, the district court may, in its discretion, deny their motion or impose other sanctions." *Dwarven Forge, LLC v. Whitaker*, No. 17 Civ. 2053 (VAB), 2020 WL 3489407, at *9 (D. Conn. June 26, 2020). However, a number of factors counsel against sanctioning Plaintiff, including his *pro se* status and the fact that he has limited access to the prison law library. *See, e.g.*, *Langer v. 121 Inflight Catering, LLC*, No. 14 Civ. 861 (MPS), 2016 WL 868156, at *1 n.1 (D. Conn. Mar. 7, 2016) ("Given [the plaintiff's] *pro se* status . . . I choose not to impose such sanctions and consider the

---

[14]   Defendants have certified that they served Plaintiff with a "Notice to Self-Represented Litigant Concerning Motion for Summary Judgment," which warned Plaintiff about the rules governing Defendants' motion. *See* Doc. 21-8.

evidence in the record in light of [the plaintiff's] arguments."); *cf. Claude v. Wells Fargo Bank, N.A.*, No. 13 Civ. 535 (VLB), 2015 WL 5797007, at *3 (D. Conn. Sept. 30, 2015) ("Plaintiff has failed to clearly respond to the Defendant's assertions proffered in its 56(a)1 statement, and he has also failed to provide a proper 56(a)2 statement in connection with his summary judgment opposition.   Because Plaintiff is proceeding *pro se*, the Court will liberally construe his submissions." (citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006)).

Additionally, the Court was easily able to compare Plaintiff's Rule 56(a) statement to his other submissions, including his affidavit and Amended Complaint.   *See Ricci v. Destefano*, No. 04 Civ 1109 (JBA), 2006 WL 2666081, at *3 (D. Conn. Sept. 15, 2006) (noting in connection with a motion to strike that, "Local Rule 56(a)1 specifically provides that a court will consider only statements 'supported by the evidence.'   Parties should assume that courts will undertake this obligation faithfully and fully review the proffered evidence of record and draw appropriate conclusions." (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003)); *Colon*, 58 F.3d at 872 (rejecting the defendants' argument regarding the plaintiff's lack of compliance with Rule 56 because they failed to take note that he had filed a verified complaint, which is "to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)").   Therefore, the Court declines at this time to sanction Plaintiff for his noncompliance with the local rules.

### 2.      Fourth Amendment Violation

The Court now turns to Plaintiff's claim that the strip search that Ogando ordered violated the Fourth Amendment, which "protects individual privacy against certain kinds of governmental intrusion."   *Katz v. United States*, 389 U.S. 347, 350 (1967).   In the prison

context, the amendment proscribes unreasonable searches. *See Bell v. Wolfish*, 441 U.S. 520, 558 (1979).

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application" and each case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559. Courts must consider: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating it; and (4) the place in which it is conducted. *Id.*; *see also Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016).

With respect to strip searches, in particular, the Second Circuit has recognized that inmates retain a "limited right to bodily privacy," and "'[a] strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body is a serious invasion of privacy.'" *Harris*, 818 F.3d at 57–58 (quoting *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 344–45 (2012) (Breyer, J., dissenting)). However, courts have upheld strip searches as reasonable security measures even when probable cause for the searches was absent as long as the searches were related to legitimate penological or security interests. *See, e.g.*, *Florence*, 556 U.S. at 326–30, 338–39; *Bell*, 441 U.S. at 558–60. Notably, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgment in such matters." *Florence*, 566 U.S. at 328 (citation and internal quotation marks omitted).

Turning to the case at bar, Defendants argue that all four *Bell* factors weigh in favor of granting their motion. With respect to the first two factors, Defendants claim that there is no evidence to suggest the scope or manner of the search was particularly invasive, as it was not a

"manual body cavity search" or a "cross gender search." Defs.' Mem. at 21. Plaintiff does not appear to disagree with this. Rather, the Parties' disagreement focuses on the latter two *Bell* factors: the search's justification and location. The Court will address these in inverse order.

Defendants claim that the strip search of Plaintiff was routine and performed in accordance with Administrative Directive 6.7 "in the privacy of an office within the L-pod vestibule." *Id.* That directive dictates, in relevant part: "An inmate strip-search shall normally be conducted in an area out of view of individuals not involved in the search process and shall not normally require physical contact by staff." DOC Administrative Directive 6.7 § 7. According to Defendants, the search took place in a "private area," because the L-pod vestibule "contains multiple private officers . . . to ensure the privacy of the inmates being searched." Defs.' 56(a) ¶¶ 57, 61.

Plaintiff disputes the privacy of the search, arguing that he was strip searched "in a room that wasn't private at all." Pl.'s 56(a), at 7 ¶ 57. Rather, according to Plaintiff, he was strip searched in the "second room to your left when you walk into the vestibule of [the] L-pod." *Id.* Plaintiff claims that there was "no privacy whatsoever" because that room contains "two big windows" and an additional "smaller window in the door." *Id.* As a result, Plaintiff claims that Ogando "peeked in the room several times while plaintiff was being strip searched," and that other officers and inmates could see Plaintiff undressing. *Id.*

The Parties' dispute regarding the privacy of the search is not, in and of itself, sufficient to defeat Defendants' motion for summary judgment. Although the Court sympathizes with Plaintiff because he may have felt embarrassment as a result of the search, many district courts in this Circuit have ruled that accusations of humiliation and embarrassment caused by strip searches, on their own, do not rise to the level of a Fourth Amendment violation, specifically

recognizing that "neither the presence of cameras nor the presence of other inmates and employees of a correctional facility makes an otherwise constitutional strip search unconstitutional." *Smith v. City of New York*, No. 14 Civ. 5934 (JCF), 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015) (collecting cases); *see also Dixon v. Santiago*, No. 15 Civ. 1575 (JAM), 2015 WL 9582729, at *2–3 (D. Conn. Dec. 30, 2015) (collecting cases); *cf. Green*, 2019 WL 2015849, at *4 (concluding, in the context of an initial review order, that the plaintiff failed to state a cognizable Fourth Amendment claim regarding a strip search, even though it occurred in a bathroom with the door open which allegedly permitted two female nurses to see him naked while they were walking by).   Courts have repeatedly "acknowledged the degree to which strip searches may humiliate and 'invade the personal privacy of inmates,' and nonetheless upheld the use of strip searches where they further the legitimate interest of discovering contraband." *Walker v. Ponte*, No. 14 Civ. 8507 (ER), 2016 WL 4411415, at *4 (S.D.N.Y. Aug. 18, 2016) (quoting *Bell*, 441 U.S. at 560).

Instead, as noted *supra*, a plaintiff must provide evidence that a strip search did not serve any legitimate penological purposes, or that a search was specifically "designed to intimidate, harass or punish."   *See Davila v. Messier*, No. 13 Civ. 81 (SRU), 2014 WL 4638854, at * 6 (D. Conn. Sept. 17, 2014) (collecting cases).   Plaintiff has raised a triable issue on this point.

Defendants claim Ogando ordered Plaintiff's strip search because of a penological purpose: "due to concerns over the smuggling of contraband."   Defs.' Mem. at 21.   They claim that Plaintiff was returning from work at the hospital where he had access to "a plethora of contraband including syringes" and that Ogando's "years of experience taught him that these items can be smuggled into the housing units and . . . can be used as weapons."   *Id.* at 21–22. In contrast, Plaintiff contends that, "[t]here was not [a] reasonable security justification for the

plaintiff to be strip searched." Pl.'s Mem. at 14. Rather, according to Plaintiff, Ogando had only received reports that inmates were removing items from the kitchen, yet Plaintiff lacked "access to the facility kitchen to in any way justify defendant Ogando having him strip searched." *Id.* at 13.

The Parties' disagreement is analogous to *Davila*, 2014 WL 4638854, in which Chief Judge Underhill denied the defendants' motion for summary judgment because there was a dispute regarding the penological basis for a strip search. *See id.* at *6. The manner of the search in *Davila* was significantly more egregious and involved abhorrent sexual allegations, but the plaintiff in that case similarly disputed that the defendants had any penological basis for the search: the plaintiff claimed that, contrary to the defendants' assertions, he had not misused his smudging supplies. *See id.* On the basis of the disputed facts in that case, this Court concluded that, "[b]ecause the parties' credibility must be determined by the trier of fact, the defendants' motion for summary judgment is denied on the Fourth Amendment claim regarding the strip search." *Id.*

The case at the bar is similar. Defendants claim that Ogando had a legitimate penological objective in ordering the strip search of Plaintiff—that Plaintiff may have smuggled contraband out of the hospital unit. Plaintiff disputes this, arguing that Ogando had no legitimate penological objective in ordering a strip search because he had only received reports of contraband smuggling from the kitchen, not the hospital. Plaintiff's theory is further supported by the statement that Ogando allegedly made regarding his purported true purpose for ordering the search—that Plaintiff liked filing lawsuits. The Court cannot resolve these credibility determinations on this motion. *Cf., e.g., Holloway v. Dep't of Corr.*, No. 11 Civ. 1290 (VLB), 2013 WL 4834657, at *7 (D. Conn. Sept. 10, 2013) (denying the defendants'

motion for summary judgment with respect to the plaintiff's Fourth Amendment strip search claim because the "conduct, verbal remarks and demeanor" of the plaintiff and prison official during the search caused "the court to question whether the controlled strip-search was undertaken with the intent to harass and intimidate the plaintiff rather than for a legitimate penological purpose").[15]

Construing the evidence in a light most favorable to Plaintiff, and making all reasonable inferences in his favor, he has raised a triable issue regarding Ogando's motivation for ordering the search.

### 3.    Qualified Immunity

Even though the Court has concluded that Plaintiff has raised triable issues with respect to his retaliation and Fourth Amendment claims, Defendants argue that the claims should nonetheless be dismissed because they are entitled to qualified immunity.  Defs.' Mem. at 27.

When public officials invoke qualified immunity at the summary judgment stage, courts must consider: "(1) whether the evidence, viewed in the light most favorable to the plaintiff, makes out a violation of a statutory or constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  *Cugini v. City of New York*, 941 F.3d 604, 611 (2d Cir. 2019).

With respect to the first prong of the qualified immunity analysis, the Second Circuit has reminded district courts that they are "not to define clearly established law at a high level of generality."  *Francis v. Fiacco*, 942 F.3d 126, 146 (2d Cir. 2019) (citation and internal quotation

---

[15]   As noted *supra*, to defeat Defendants' motion, Plaintiff must provide evidence that the search did not serve any legitimate penological purpose, or that it was specifically "designed to intimidate, harass or punish."  *See Davila*, 2014 WL 4638854, at * 6.  In addition to raising a triable issue regarding the absence of a legitimate penological purpose in connection with the search, there also potentially is a triable issue regarding whether Ogando merely tried to intimidate or punish Plaintiff, for the reasons discussed in *supra* Section III.A.1, in connection with Plaintiff's retaliation claim.  *See, e.g.*, *Holloway*, 2013 WL 4834657, at *6.  However, the Court will not address this in detail because the Parties have not thoroughly briefed this issue.

marks omitted).   Instead, it must be "particularized to the facts of the case." *Id*. (citation and internal quotation marks omitted).

Additionally, with respect to the second prong, to determine if a right is "clearly established," courts consider "Supreme Court decisions . . . [Second Circuit] decisions, and decisions from other circuit courts." *Simon v. City of New York*, 893 F.3d 83, 92 (2d Cir. 2018). As the Second Circuit has recently reemphasized, although the doctrine "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.   That precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Francis*, 942 F.3d at 145–46 (citations and internal quotation marks omitted).

Courts have discretion to determine which prong of the analysis to address first. *See Johnson v. Perry*, 859 F.3d 156, 170 (2d Cir. 2017).[16]   Ultimately, though, defendants bear the burden of establishing that they are entitled to the qualified immunity defense. *See Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) ("Qualified immunity is an affirmative defense on which the defendant has the burden of proof." (citations omitted)).

The Court now turns to the case at bar, and the Court will first analyze whether Ogando is entitled to qualified immunity on Plaintiff's retaliation claim.

No Party has briefed, for purposes of a qualified immunity inquiry, whether Plaintiff has made out a violation of a constitutional right in connection with the strip search.   However, it is clear from the evidence, viewed in the light most favorable to Plaintiff, that Plaintiff has made

---

[16]   In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court held that the initial inquiry must be whether "the facts alleged show the officer's conduct violated a constitutional right," and only after this step could a court determine "whether the right was clearly established." *Id*. at 201.   In *Pearson v. Callahan*, 555 U.S. 223 (2009), however, the Supreme Court receded from this approach, having concluded that "the judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Id*. at 242.

out a violation of a constitutional right, or he has at least raised a genuine issue of fact regarding a violation: that he has a constitutional right of access to the courts, and Ogando retaliated against him for his exercise of that right.   As the Court discussed in detail *supra*, Plaintiff has presented evidence that Ogando learned of Plaintiff's prior lawsuit and took action—ordering plaintiff's strip search—in response to Plaintiff's protected activity.   *See supra* Section III.A.1.

It is also beyond dispute that this right to be free from retaliation has been clearly established for many years.   In *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988), the Second Circuit observed the following regarding an inmate's access to the judiciary:

> In the prison context, we have held that inmates must be permit[ted] free and uninhibited access . . . to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. . . .   Like the right of access to the courts, the right to petition is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied.   Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that . . . section 1983 [is] intended to remedy.

*Id.* at 589 (citations and internal quotation marks omitted).

Other courts in this Circuit have likewise recognized that it is "clearly established" that prison officials cannot retaliate against inmates for filing lawsuits.   *See, e.g.*, *Farid v. Goord*, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002) (ruling that the qualified immunity doctrine did not provide the defendants with a defense because "[a] prisoner's right against retaliation for engaging in protected First Amendment activities, such as petitioning the government for redress of grievances, has been clearly established since at least 1988").   Accordingly, Ogando is not entitled to qualified immunity with respect to Plaintiff's retaliation claim.

Defendants nonetheless try to distinguish this case, arguing that Plaintiff was subject to a "lawful and routine" strip search under the Fourth Amendment, and it is not "clearly established"

that a lawful search can constitute a violation of the First Amendment.  Defs.' Mem. at 30.  In support of that argument, Defendants claim that the *Pizarro* case in the Southern District of New York, which the Court discussed *supra*, "demonstrates that whether a search that is lawful under the Fourth Amendment can constitute [an] adverse action under the First Amendment is at least an open question and therefore the law cannot be clearly established," because "*Pizarro* held that otherwise lawful and routine strip searches do not constitute adverse action."  *Id*.

Defendants' argument is misguided because it relies on a faulty premise: that it is undisputed that the strip search of Plaintiff was lawful under the Fourth Amendment, similar to the search in *Pizarro*.  In that case, the strip search at issue did not qualify as an adverse action because the plaintiff presented no evidence which demonstrated "why a routine and ordinarily lawful strip search would deter a typical prisoner from exercising his or her First Amendment rights," and the plaintiff "plead[ed] no facts indicating that the . . . officer singled out Plaintiff." *Pizarro*, 2018 WL 3462512, at *6.  In the case at bar, in contrast, Plaintiff *has* raised a triable issue regarding the legality of the strip search: he has proffered evidence tending to show that Ogando had *no* legitimate purpose for ordering the search and merely sought to retaliate against Plaintiff.  Defendants' argument therefore does not alter the Court's analysis that it was "clearly established" at the time of Plaintiff's strip search that prison officials may not retaliate against inmates in response to their filing of lawsuits.  *See, e.g.*, *Show v. Patterson*, 955 F. Supp. 182, 193 (S.D.N.Y. 1997) ("[A] material issue of fact exists as to whether the manner in which the search was conducted was objectively unreasonable and thus violative of the First and Fourth Amendments.  Since this fact is material to the determination of qualified immunity, summary judgment on plaintiffs' First and Fourth Amendment claims cannot be granted on qualified

immunity grounds.").[17]

The Court now turns to the qualified immunity inquiry in connection with Plaintiff's Fourth Amendment claim. Once again, the analysis asks whether Plaintiff has made out a constitutional violation. And, once again, the Court concludes, for substantially the same reasons that were discussed *supra*, that Plaintiff has raised a triable issue regarding whether the strip search that Ogando ordered violated the Fourth Amendment. *See supra* Section III.A.2. As noted *supra*, Plaintiff has raised a material dispute about whether the search served any legitimate penological purpose, or if it was specifically designed to intimidate, harass, or punish Plaintiff. *See id.*

Turning to the second prong of the qualified immunity analysis, it is clear that Plaintiff's rights under the Fourth Amendment have been "clearly established" for a long period of time. In fact, just two years prior to Ogando's strip search order of Plaintiff, I explained that, "[c]learly established law at the time of the searches [in that case] recognized that searches conducted without legitimate penological purposes or designed to intimidate, harass or punish were unreasonable and unconstitutional." *Green*, 224 F. Supp. 3d at 166 (citation omitted). Other courts in this Circuit have made similar observations. *See, e.g., George v. City of New York*, Nos. 12B6365, 13B3511, 13B3514, 2013 WL 5943206, at *10–11 (S.D.N.Y. Nov. 6, 2013) ("An

---

[17]   For similar reasons, the Court rejects Defendants' related argument that, "the existence of *Pizarro* demonstrates that at the very least, there is a split amongst the district courts of this Circuit on this issue." Defs.' Mem. at 30. In support of that argument, Defendants cite to *Gill v. DeFrank*, 8 F. App'x 35, 37 (2d Cir. 2001), where the Second Circuit affirmed a district court's grant of qualified immunity to prison officials on the basis of a "disagreement . . . among district courts" regarding the law governing a plaintiff's Free Exercise claim. *Id.* at 37. The Second Circuit agreed with the district court's finding that, "it [could not] be said that the law was 'clearly established' at the time of the relevant events" because of the disagreement among district courts. *Id.* Turning to the case at bar, it is unclear which "disagreement" Defendants are referring to, as an initial matter: they have only cited to *one* district court case in this portion of their brief. Putting that aside, the possible disagreement to which Defendants refer is neither here nor there. Even if there is a divergence among district courts regarding whether a *lawful* search under the Fourth Amendment can state a claim for retaliation—on which this Court does not take a position in this Ruling—that does not alter the fact that the Court has concluded that Plaintiff *has raised a triable issue regarding the lawfulness of the search*. Accordingly, Defendants' additional argument is unpersuasive.

unbroken line of authority in the Supreme Court and the Second Circuit has repeatedly affirmed that prison authority actions are not entitled to deference—and may be held unconstitutional—whenever they are not undertaken pursuant to any legitimate penological goal, or are designed to intimidate, harass, or punish.").

Defendants nonetheless argue that not "every reasonable official would have understood that ordering that kind of search violates the Fourth Amendment." Defs.' Mem. at 30 (citing *Taylor v. Barkes*, 575 U.S. 822 (2015)). This argument is not persuasive. The Court finds it difficult to believe that a reasonable official—who, if Plaintiff's account is to be believed, ordered a strip search in retaliation and without any legitimate purpose—would not have understood that it was a constitutional violation. That is particularly so given the Supreme Court and Second Circuit's decades-old case law barring the conduct.

Lastly, Defendants claim that in order for the law to be "clearly established," Plaintiff "would have to point to a Second Circuit or Supreme Court case wherein an inmate's Fourth Amendment rights were violated based on a private search, ordered by a male staff member, and where the inmate was returning from an area of the prison where weapons and contraband were easily accessible." *Id.*

The Court rejects this argument, as well. If that were the case, it would conveniently insulate Ogando from liability regardless of his true motivations for ordering the strip search. In fact, a variation of Defendants' argument was rejected in *George*, 2013 WL 5943206, an analogous case, albeit in a ruling resolving a motion to dismiss. In that case, the plaintiffs alleged that prison officials conducted strip searches "in order to humiliate the inmates and to 'make a spectacle' of the inmates." *Id.* at *7. After concluding that the plaintiffs adequately and plausibly alleged a Fourth Amendment violation, the court then addressed defendants'

argument that they were entitled to qualified immunity. *See id.* at *11. The court framed the "clearly established" inquiry in the following way: "[t]he issue in this action is not whether inmates have a general right to be free from visual strip searches, but rather whether the challenged search was conducted with any legitimate penal purpose." *Id.* With that in mind, the court then ruled that the defendants' invocation of qualified immunity failed because, "clearly established law in the Second Circuit [at the time of the search] demonstrated that a strip search conducted without a legitimate penological purpose violated constitutional rights." *Id.*

The case at bar is analogous. The issue is not whether "a private search, ordered by a male staff member, and where the inmate was returning from an area of the prison where weapons and contraband were easily accessible," violates "clearly established" law, as Defendants contend. Defs.' Mem. at 30. It is beyond doubt that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence*, 566 U.S. at 328. Rather, similar to *George*, the question is whether the challenged search of Plaintiff was conducted with *any* legitimate penological purpose. Because that is a disputed fact, Defendants' assertion of the qualified immunity defense must fail. *See Kelleher v. New York State Trooper Fearon*, 90 F. Supp. 2d 354, 361 (S.D.N.Y. 2000) ("It is well established that it is within the province of the jury to decide factual issues with respect to the defense of qualified immunity." (citing *Kim v. Hurston*, 182 F.3d 113 (2d Cir. 1999)).

Accordingly, Defendants are not entitled to qualified immunity on either of Plaintiff's claims related to the strip search, and Defendants' motion for summary judgment is DENIED with respect to Plaintiff's retaliation and Fourth Amendment claims.

**B.      Medical Treatment**

The Court next turns to Plaintiff's claims related to his medical treatment: that Dr. Naqvi was deliberately indifferent to Plaintiff's serious medical needs and was reckless under state law.

**1.      Temporal Scope of Claims**

Before addressing the merits of Plaintiff's medical treatment claims, the Court must first address a preliminary argument made by Defendants: that Plaintiff signed a settlement agreement that released Defendants from liability from all claims based on conduct that occurred prior to February 8, 2018.  Defs.' Mem. at 14.  Defendants do not contend that this agreement bars Plaintiff's claims related to the strip search, which the Court has just addressed, because the search occurred in July 2018, after the settlement agreement's execution.  Defs.' 56(a) ¶¶ 42–43.

As the Second Circuit has stated, "[a] settlement agreement is a contract that is interpreted according to general principles of contract law."  *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007).  "The proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment."  *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002).

"Under Connecticut law, the enforceability of a settlement agreement is determined using general principles of contract law."  *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 13 Civ. 293 (AWT), 2014 WL 1094451, at *2 (D. Conn. Mar. 19, 2014) (citing *Omega Engineering, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005)).  "A contract is binding if the parties have mutually assented to the terms . . . and where the terms of the agreement are 'clear and unambiguous.'"  *Id.* (quoting *Audubon Parking Assoc. Ltd. P'ship v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811 (1993)).

The language used in a contract "must be accorded its common, natural, and ordinary

meaning and usage where it can be sensibly applied to the subject matter of the contract." *Awdziewicz v. City of Meriden*, 317 Conn. 122, 129 (2015) (citation and internal quotation marks omitted). Additionally, "[w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." *Id.* at 129–30. "Once entered into," a settlement agreement "is binding and conclusive." *Ruiz v. City of Bridgeport*, No. 15 Civ. 253 (AWT), 2017 WL 1202651, at *2 (D. Conn. Mar. 31, 2017) (quoting *Powell*, 497 F.3d at 128).

As the Court discussed *supra* in Section I, in February 2018, Plaintiff entered into a settlement agreement in *Johnson v. Trestman*, No. 14 Civ. 856 (SRU). Defs.' 56(a) ¶ 41. The agreement, which is dated and signed by Plaintiff on February 8, 2018, provided for the dismissal of that case with prejudice in exchange for a payment of $1300, among other provisions in his favor. *See* Doc. 21-4 ("Settlement Agreement"), at 1. In exchange, Plaintiff agreed to:

> [R]elease and forever discharge . . . all other present and former . . . . employees of the State of Connecticut . . . from all actions, causes of action, suits, claims . . . whether known or unknown, whether accrued or not accrued . . . which the Plaintiff . . . ever had or now have . . . from the beginning of the world up to the date of this Agreement only. . . . This release . . . includes . . . all causes of action alleging violations of the plaintiff's state and federal constitutional rights, his rights arising under the statutes and laws of the United States and/or the State of Connecticut, and such causes of action as may be available under the common law.

*Id.* at 3–4.

Defendants claim that Plaintiff has released Defendants—who are employees of the State of Connecticut—and forever discharged them from any medical treatment-related claims that preceded the agreement. *See* Defs.' Mem. at 8. According to Defendants, the settlement terms are "clear and unambiguous and therefore must be enforced." *Id.* at 14.

The Court agrees. The settlement agreement reached in *Johnson v. Trestman* clearly

bars Plaintiff's claims related to conduct preceding February 8, 2018. The scope of the release is broad: it applies to all known *or unknown* causes of action, including federal claims, such as deliberate indifference, as well as common law claims, such as recklessness. *See id.* at 4.

The breadth of the settlement agreement in this case is distinctly different than the narrower release at issue in *Gulley v. Mulligan*, No. 18 Civ. 858 (SRU), 2019 WL 2062431 (D. Conn. May 9, 2019). In that case, the waiver applied only to claims "arising out of, or in any way related to the *incidents or circumstances which formed the basis for the above referenced civil action[s]*." *Id.* at *3 (emphasis added). Thus, when the plaintiff filed a subsequent lawsuit to litigate claims that were unrelated to the prior lawsuit, this Court determined that the plaintiff's release did not bar his new claims, because they "concerned events that took place at different dates against different DOC officials and appear entirely unrelated to the events that formed the basis of the instant case." *Id.* at *4. In contrast, in the case at bar, Plaintiff's settlement agreement is broader. It applies to, "*but [is] not limited to*, acts arising out of, or in any way related to the incidents or circumstances which formed the basis for the Suit." Settlement Agreement at 3 (emphasis added). The settlement agreement here therefore not only applies to claims that are connected to the circumstances that gave rise to *Johnson v. Trestman*, but also other, unrelated claims, such as Plaintiff's medical treatment prior to February 8, 2018, which has catalyzed the current lawsuit.

For his part, Plaintiff claims that the settlement agreement "has nothing to do with this present case and was only for the parties in that case." Pl.'s 56(a), at 6 ¶ 41. According to Plaintiff, his agreement covered only the "parties of that suit not parties of future suits." *Id.* at 6 ¶ 42.

The Court disagrees with Plaintiff. The agreement not only applies to the defendants of

that case, but also, contrary to Plaintiff's assertion, to "*all other* present and former . . . employees of the State of Connecticut." Settlement Agreement at 3 (emphasis added). Courts in this Circuit have rejected similar arguments where the settlement agreements at issue released claims against all state employees. *See, e.g.*, *Carter v. Ponte*, No. 17 Civ. 1830 (VSB), 2018 WL 4680995, at *5 (S.D.N.Y. Sept. 28, 2018) (awarding summary judgment to the defendants because a release plainly barred the plaintiff from bringing any claims against the City of New York or "*any of its officers* for any civil rises claims arising prior to the date it was executed" (emphasis added)); *Smickle v. City of New York*, No. 16 Civ. 3333 (VSB), 2018 WL 1578381, at *4 (S.D.N.Y. Mar. 29, 2018) (concluding, on a motion to dismiss, that an agreement barred the plaintiff from bringing any claims against "all past and present . . . employees . . . of the City of New York" for all claims that "occurred through the date of [the release]"); *Brown v. UConn Managed Health Care*, No. 13 Civ. 931 (JBA), 2016 WL 777888 (D. Conn. Feb. 26, 2016) ("The release specifically references future related claims and applies to claims against *any employees* of the Department of Correction or Correctional Managed Health Care. It is not restricted to any particular defendants. The fact that several defendants in this case were not named in the prior state case is irrelevant." (emphasis added)). The wording of the instant release, creating the broadest possible shield for the released party, is explicitly intended to achieve that result, and is expressed in terms now so familiar that they appear in printed forms of general releases available for sale from legal stationers.

Accordingly, the Court concludes that Plaintiff's settlement agreement bars his claims related to his medical treatment that occurred prior to February 8, 2018.[18]

---

[18]   The Court notes that Plaintiff has not directly asserted, nor is there any indication in his submissions, that his release was not knowing or voluntary. The Second Circuit has made clear that, "the validity of a release is a peculiarly fact-sensitive inquiry" and courts should employ a "totality of the circumstances" test to determine whether a release was knowing and voluntary. *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437–38 (2d

## 2.      Deliberate Indifference

The Court now turns to Plaintiff's claim that that Dr. Naqvi was deliberately indifferent to Plaintiff's serious medical needs, based on Dr. Naqvi's alleged failure to treat Plaintiff's injuries stemming from a falling cabinet door.

The Eighth Amendment's prohibition on cruel and unusual punishment protects against deliberate indifference to a prisoner's serious medical needs by prison officials. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   To demonstrate deliberate indifference to medical needs, a plaintiff must demonstrate harmful acts or omissions that deny or unreasonably delay access to needed medical care or wantonly cause infliction of unnecessary pain.   *Id*. at 104–06. Accordingly, not all failures by prison staff to provide medical care rise to the level of a constitutional violation. *Id*.; *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").   "[A] prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability."   *Smith*, 316 F.3d at 184.

The deliberate indifference standard consists of two prongs: (1) the alleged deprivation

---

Cir. 1998).   Factors relevant to that inquiry include: "1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds . . . benefits to which the [plaintiff] was already entitled by contract or law."   *Id*. at 438.   Although the record does not appear to provide any evidence regarding the first three factors, the latter three factors point toward a knowing and voluntary waiver: the settlement agreement clearly releases Defendants from liability in connection with Plaintiff's federal and state constitutional and statutory, as well as common law claims, *see* Settlement Agreement at 4; Plaintiff was represented by an attorney, *see id*. at 2; and, Plaintiff received various benefits under the agreement, *see id*. at 1–3. *See also, e.g., Valdiviezo v. City of New York*, No. 15 Civ. 3902 (AJN), 2020 WL 2793090, at *5 (S.D.N.Y. May 29, 2020) (awarding summary judgment to the defendants after ruling that the plaintiff's general release "constitute[d] a valid knowing and voluntary waiver of [the plaintiff's] constitutional rights" which he brought pursuant to section 1983).

must be, objectively, "sufficiently serious" to produce death, degeneration, or extreme pain; and (2) subjectively, the defendant must have been aware of a substantial risk that the inmate would suffer serious harm by defendant's act or omission. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Salahuddin v. Goord*, 467 F.3d 263, 279B80 (2d Cir. 2006).

As to the first prong, "[a] 'serious medical need' exists where, objectively, the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (quoting *Harrison v. Barkly*, 219 F. 3d 132, 136 (2d Cir. 2000)).

As to the second, subjective prong, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions, that is:

> [T]hat [the defendant] harbored the requisite mental state while he denied . . . treatment. He must show that [the defendant] knew of and disregarded an excessive risk to [plaintiff]'s safety; that he not only was aware of facts from which a reasonable person would conclude [plaintiff] faced an excessive risk, but that he personally actually drew that inference.

*Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012) (*per curiam*). Thus, an allegation of mere negligence is insufficient. Instead, the subjective element requires that an inmate allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280.

The Court now turns to the case at bar, and in particular to the second element of Plaintiff's claim, which is dispositive.[19]

---

[19]  Even if the Court were to analyze the objective element of Plaintiff's deliberate indifference claim, the Court doubts that Plaintiff would satisfy this element.  It is true that an inmate's claim of extreme pain over the course of many months could satisfy the first prong of the analysis. *See Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (reversing district court's determination on a motion for summary judgment that pain that fell somewhere between "annoying" and "extreme" was not objectively serious and noting that the court does not "require an inmate to

The gravamen of Plaintiff's claim is that Dr. Naqvi was deliberately indifferent to Plaintiff's medical needs because Dr. Naqvi was aware of Plaintiff's extreme pain but "disregard[ed] [it] for months." Pl.'s Mem. at 13. Plaintiff contends that he "continuously told [Dr.] Naqvi that the pain medication he was issuing plaintiff did not help with his pain." *Id.*

As the Court discussed in its IRO, Plaintiff alleges that Dr. Naqvi was aware of Plaintiff's pain as soon as June 25, 2017, and he had continued knowledge of Plaintiff's pain because Plaintiff repeatedly submitted grievances to Dr. Naqvi regarding his condition. *See Johnson*, 2018 WL 6421059, at *8; *see also* Doc. 26, at 47–63 (Plaintiff's inmate request forms complaining about his shoulder pain). As the Court also explained in its IRO, the first action that Dr. Naqvi allegedly took to relieve Plaintiff of his pain was on March 21, 2018, when Dr. Naqvi prescribed naproxen to Plaintiff. *See id.*

As an initial matter, because Plaintiff in his settlement agreement released his claims against all DOC employees that preceded February 8, 2018—including those potentially against Dr. Naqvi—the Court need only focus on the alleged delay in treatment that took place from February 8, 2018 to March 21, 2018. *See supra* in Section III.B.1.

However, even if the Court were to examine the entire period during which Plaintiff alleges that Dr. Naqvi delayed providing Plaintiff with medical care, it is now clear on this motion for summary judgment, with an enhanced evidentiary record, that Plaintiff *had* an active

---

demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one"); *Todaro v. Ward*, 565 F.2d 48, 52 (2d Cir. 1977) ("[T]he Eighth Amendment forbids not only deprivations of medical care that produce physical torture and lingering death, but also less serious denials which cause or perpetuate pain."). However, as Defendants point out, "due to the general release signed by Plaintiff, the only relevant time period for this Court to consider is between February 8, 2018 and March 11, 2018—the date when the alleged 'delay' in providing Plaintiff pain medication ended." Defs.' Mem. at 18. The record shows that Plaintiff was receiving pain medication during this time, but even if that were not the case, courts have held that delays involving the provision of pain medication for shorter periods of time do not satisfy the objective element of a deliberate indifference claim. *See Bilal*, 2010 WL 2506988, at *11 (collecting cases noting that a delay in pain medication for a few hours or days was not objectively serious for purposes of a deliberate indifference claim).

prescription of some form of pain medication for the entirety of the relevant time period. Accordingly, regardless of the precise time frame, Defendants' motion for summary judgment should be granted with respect to Plaintiff's deliberate indifference claim.

As noted above, Plaintiff claims that Dr. Naqvi was aware of Plaintiff's pain as soon as June 25, 2017, and that he failed to treat plaintiff.  But, as Defendants point out—and Plaintiff does not dispute—Dr. Naqvi issued Plaintiff a three-month long prescription for ibuprofen in May 2017.  Defs.' Mem. at 18.  The prescription lasted until August 2017, and it was renewed for an additional three months until November 2017.  *See id*.  Dr. Naqvi then authorized a three-month prescription of Elavil for Plaintiff for the treatment of neuropathic pain, which lasted until November 2017.  *See id*.  That prescription was then renewed for an additional three months until February 2018, and it was renewed again by a nurse practitioner until May 2018 (along with the renewal, the nurse practitioner also increased the dosage from twenty-five to fifty milligrams).  *See id*.  Lastly, in March 2018, Dr. Naqvi prescribed for Plaintiff two different pain medications: naproxen and again, ibuprofen.  *See id*.  Thus, contrary to Plaintiff's claims, Dr. Naqvi did not delay or fail to treat Plaintiff's pain; he consistently prescribed various types of pain relievers.

Plaintiff nonetheless argues that he disagreed with Defendants' pain management prescriptions: he apparently stopped taking Elavil because it made him sleepy, and Naproxen and Motrin "did absolutely nothing to help plaintiff's pain."  *Id*.  In response, Defendants claim that "an inmate's dissatisfaction with the type, strength, or amount of pain medication he received simply does not state a claim for deliberate indifference."  Defs.' Mem. at 17.

The Court agrees with Defendants.  It is well established that an inmate's disagreement with his or her medical treatment does not state a claim for deliberate indifference.  *See Hill v.*

*Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." (citation omitted)); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

The Second Circuit in *Hill* applied this principle in the context of an inmate's claim that he was not receiving a sufficiently high dose of a particular medication.  *See Hill*, 657 F.3d at 123.  In that case, which involved a motion to dismiss, the plaintiff alleged that he was denied medical care, "leaving him needlessly to suffer."  *Id.*  He contended that he repeatedly complained that the Motrin medication prescribed by a nurse practitioner "was insufficient" to treat the plaintiff's pain and that "stronger pain medication was required."  *Id.*  The court, nonetheless, concluded that the plaintiff's complaint failed to state a claim of deliberate indifference because there was "no allegation that either medical provider acted with a culpable state of mind."  *See id.*

With that guidance in mind, courts in this circuit have come to a similar conclusion regarding a plaintiff's disagreement with the type, quantity, or strength of prescribed pain medication.  *See, e.g.*, *Rawls v. Rosenfield*, No. 16 Civ. 582 (LEK) (CFH), 2017 WL 7050648, at *14 (N.D.N.Y. Nov. 28, 2017), *report and recommendation adopted*, 2018 WL 542249 (N.D.N.Y. Jan. 23, 2018) (concluding that the plaintiff's allegations that he requested and was denied Neurontin, even though he had already been prescribed Motrin, did not create a material issue of fact precluding summary judgment); *Hodges v. Northrup*, No. 10 Civ. 531 (GLS) (TWD), 2014 WL 316729, at *8 (N.D.N.Y. Jan. 28, 2014) (granting summary judgment and

concluding that the plaintiff "may not have been given pain medication that was as strong as he wanted"—he was authorized to take over-the-counter Motrin or Tylenol, but he requested the pain killer Fioricet—"but the evidence establishe[d] that pain medication was made available to him for his knee injury"); *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004) (awarding summary judgment to the defendants on the plaintiff's deliberate indifference claim on the basis of the plaintiff's claim that he was denied stronger pain medication because the plaintiff did "not offer any evidence or allegations that stronger medication was not provided for any reason other than a medical decision"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006).

Turning to the case at bar, Plaintiff's dissatisfaction with his pain management program does not provide support for his deliberate indifference claim. Plaintiff's medical records demonstrate that he had an active prescription for some form of pain medication for the entirety of the relevant time period. Although Plaintiff disagreed with the type, quantity, or strength of the pain medication that Dr. Naqvi prescribed, that is insufficient to defeat Defendants' motion.

To be sure, the Court has sympathy for Plaintiff, whose submissions indicate that he is in a great amount of pain stemming from his shoulder injury. Nonetheless, there is no genuine dispute regarding a deliberate indifference claim, and therefore Defendants' motion for summary judgment with respect to that claim is GRANTED and the claim is DISMISSED.

### 3.    Recklessness

The Court now turns to Plaintiff's final claim: that Dr. Naqvi acted with recklessness in failing to provide Plaintiff with pain medication. According to Defendants, nothing in the record "even hints at a failure of Dr. Naqvi to satisfy the prevailing standard of care, let alone the heightened standard of recklessness." Defs.' Mem. at 19. Plaintiff does not address his recklessness claim in his brief, but he alleged in his Amended Complaint that by failing to treat

Plaintiff, Dr. Naqvi "knowingly disregarded an excessive risk to the plaintiff's life health, safety, and well being."   Am. Compl. at 10 & 58.

The Supreme Court of Connecticut has described the standard for common law recklessness in the following way:

> [W]e have described recklessness as a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . .  The state of mind amounting to recklessness may be inferred from conduct.  But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . .  Wanton misconduct is reckless misconduct. . . .  It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action.

*Doe v. Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382 (2015) (citation and internal quotation marks omitted).

This Court has previously applied the recklessness standard in *Clark v. Dowty*, No. 05 Civ. 1345 (WWE), 2007 WL 2022045 (D. Conn. July 9, 2007), in which the plaintiff alleged that police officers failed to provide him with immediate and adequate medical care when he was injured when he was arrested.  In that case, when the officers subdued the plaintiff to conduct the arrest, they used pepper spray and a baton, and the plaintiff needed approximately thirteen staples to close a head laceration.  *See id*. at *2.  The core dispute in connection with the plaintiff's recklessness claim was the timeliness and adequacy of the subsequent medical care that the officers provided: the defendants asserted that they attended to the plaintiff's medical needs at the scene of the arrest.  The plaintiff claimed, on the other hand, that he was not provided medical care until about thirty minutes later at a hospital; that the defendants had intentionally postponed the departure to the hospital to delay the plaintiff's medical care; and, that the defendants took a circuitous route to the hospital to cause further delay.  *See id*. at *8–9.

On the basis of that dispute, the Court concluded that summary judgment was inappropriate in connection with the plaintiff's recklessness claim:

> [T]here is a genuine issue of material fact as to the extent of . . . the propriety and adequacy of the medical care [that the officers] provided to the plaintiff.  From this, one may infer that the officers possessed the necessary "state of consciousness" to deem their conduct as reckless or malicious.

*Id.* at *15.

More recently, this Court denied summary judgment on a prisoner's recklessness claim involving allegations of sexual assault in *Tangreti v. Semple*, No. 17 Civ. 1420 (MPS), 2019 WL 4958053 (D. Conn. Oct. 8, 2019), *rev'd in part on other grounds sub nom. Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).   In that case, the plaintiff was subject to a number of acts of sexual abuse by prison officials.  *See id.* at *2–3.  The plaintiff reported the conduct, but the defendants did not take any precautions to reduce the risk of sexual assault to the plaintiff. *See id.*  Although the Court did not analyze the issue in detail because the parties had not thoroughly briefed their arguments regarding the plaintiff's recklessness claim, the Court nonetheless concluded that summary judgment on the recklessness claim was inappropriate.  *See id.* at *23.  According to the Court, "[s]ince recklessness liability can attach to a failure to take precautions, and because [the plaintiff] has presented evidence to support that Defendants knew of the risk of sexual assault at [the prison], [the plaintiff] has conceivably stated a recklessness claim against all Defendants."  *Id.*

The case at bar is different from *Tangreti*, which involved a claim of recklessness on a failure to protect theory, rather than a failure to provide medical care.  And, although *Clark* involved a recklessness claim involving the provision of medical care, the case at bar is distinguishable because Plaintiff in the instant case alleges that he was denied adequate medical

care over the course of many months, rather than approximately thirty minutes. Yet, the principles remain the same: there must be a genuine dispute regarding Dr. Naqvi's "state of consciousness," "something more than a failure . . . to take reasonable precautions to avoid injury"—he must have engaged in conduct that indicates a reckless disregard of Plaintiff's rights. *Doe*, 317 Conn. at 382.

Here, Defendants assert that there is no genuine dispute regarding Dr. Naqvi's "state of consciousness." The Court agrees. Although Plaintiff claims that he was not provided with adequate healthcare, his undisputed medical records tell a different story: that Dr. Naqvi repeatedly prescribed Plaintiff various forms of medication to relieve Plaintiff's pain, as the Court recounted *supra* in connection with its discussion of Plaintiff's deliberate indifference claim. Although Plaintiff asserts that the medication did not cause his pain to fully abate, that in and of itself does not indicate that Dr. Naqvi possessed a "state of consciousness" such that he recklessly disregarded Plaintiff's health and safety.

This case is also markedly different from *Clark* and *Tangreti*, where summary judgment was not warranted. In contrast to *Clark*, the evidentiary record does not indicate that Dr. Naqvi intentionally engaged in any conduct that shows recklessness, such as the *Clark* defendants' failure to provide medical care at the scene of the arrest, and their decision to take a circuitous route to the hospital. And, in contrast to *Tangreti*, where the defendants were allegedly aware of the plaintiff's claims of sexual assault—and failed to take any action—Dr. Naqvi in this case *repeatedly* prescribed medication and even changed the prescription on a number of occasions.

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's recklessness claim is GRANTED, and Plaintiff's claim is DISMISSED.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.   The Court makes the following Order:

1.      Defendants' motion for summary judgment is DENIED with respect to Plaintiff's claims of retaliation against Ogando for a strip search without a penological purpose, and a Fourth Amendment violation against Ogando for the same strip search.

2.      Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims of deliberate indifference to serious medical needs against Dr. Naqvi regarding his failure to treat Plaintiff's injuries, and recklessness under state law against Dr. Naqvi based on his failure to treat Plaintiff.

3.      The Parties are instructed to meet and confer for the purpose of proposing updated deadlines for all applicable remaining scheduling issues—*e.g.*, the date by which the joint trial memorandum will be filed, proposed dates for a pretrial conference after the joint trial memorandum is received, and the date by which the case will be ready for trial.   *See* Form 26(f) Report of Parties' Planning Meeting, D. Conn. L. Civ. R. Civ. App'x.   The Parties are instructed to then submit those dates to the Court by **May 21, 2021**.   Thereafter, the Court will schedule a pretrial conference to discuss the joint trial memorandum and any other pending issues in this case.

It is SO ORDERED.

Dated:       New Haven, Connecticut
             April 29, 2021

                                    *s/ Charles S. Haight, Jr.*
                                    CHARLES S. HAIGHT, JR.
                                    Senior United States District Judge